UNITED STATES of America,
Plaintiff, Appellee,

v.

Rony MANN, Defendant, Appellant.

No. 78–1009.

United States Court of Appeals,
First Circuit.

Argued Oct. 3, 1978.

Decided Dec. 29, 1978.

Larry L. Scissors, Los Angeles, Cal., for defendant, appellant.

Justo Arenas, Asst. U. S. Atty., San Juan, P. R., with whom Julio Morales Sanchez, U. S. Atty., San Juan, P. R., was on brief, for plaintiff, appellee.

Before COFFIN, Chief Judge, and ALD-RICH and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

Defendant was convicted under one count of importing and a second count of possession with intent to distribute a Schedule II controlled substance, in violation of 21 U.S.C. §§ 952(a), 960, 841(a), and 18 U.S.C. § 2, and sentenced to two concurrent eight year terms. His appeal raises several issues relating to the admission of evidence as well as the issue of effective assistance of counsel. The most significant issue concerns the propriety of the district court's allowing the deposition of the crucial prosecution witness to be taken and subsequently to be admitted into evidence. We therefore

note in some detail the circumstances surrounding the taking of the deposition, its admission at trial, and its content.

The key character in this drama, although always off stage except for the brief time when she was being deposed, was a 17 year old Australian woman, Joanne Lyndal Shine. Shine and defendant arrived on the same plane at San Juan, Puerto Rico, after a flight from Lima, Peru, via Curacao, on July 25, 1977. When her name, upon being fed into a computer, resulted in a "hit"—information that she and an associate were suspected of smuggling—she was subjected to a body search, which yielded some eleven packages of cocaine which had been taped inside her girdle. Defendant, who similarly activated the computer, was arrested shortly after Shine, although he was found not to possess any controlled substance.

Shine gave a statement to agents the night of her arrest and was detained in an adult prison facility. Meanwhile the grand jury indicted defendant on August 10, referring to a minor female who aided and abetted him but not naming Shine. On August 17 the court dismissed the charges against Shine. On August 22 the prosecution moved to take her deposition, alleging "Does appear that if the defendant returns to Australia it will be next too [sic] impossible for her to be available for the trial of the principal defendant Rony Mann."[1] The defense opposed the motion, challenging the assumption that the fact Shine was an Australian meant that she would not be present. The deposition was taken on August 26. During its course the prosecution returned to Shine both her airplane tickets and her passport "for her travelling". At the end of the deposition Shine responded in several ways to defense counsel's questions whether she would appear at the trial: "No . . . No. As far as I know . . I don't know." To the prosecution's question whether she would honor a subpoena, she said, "Yes".

A little over a month later, on October 5, the government moved for a subpoena, the trial having been set for October 17. Again the defense objected to any contemplated use of the deposition, stating that the government had "procured" Shine's unavailability by turning over plane tickets and passport, which were evidence in the case. The prosecution replied that it had exerted "all possible efforts" to have the witness present but had no authority to compel her to stay in Puerto Rico after her indictment had been dismissed. The court ordered issuance of the subpoena and subsequently the State Department cabled its embassy in Australia to request Shine's presence at trial, adding, "It is expected that she will decline, but AUSA [the Assistant U.S. Attorney] needs proof of her unavailability so her statement can be introduced at trial." The reply came back: "A consular officer spoke with the mother of Joanne Lyndal Shine, the mother stated that her daughter [sic] who is only 17 years of age will definitely not be able to go to Puerto Rico to testify in case of U. S. v. Rooney [sic] Mann."

Trial began on October 17. During argument as to the admissibility of the deposition the court asked if there had been any promise to pay Shine's expenses if she had come to testify. The prosecutor answered, "Yes, Your Honor. If I may explain to the Court what is the procedure followed . . . [T]he correct procedure . . . is we go through Mr. Robert Chamblis who in turn contacts the Department of State . . . The Department of State through the Embassy in the particular country contacts the individual and asks him whether he comes or not. If he says, yes, immediately the Embassy provides the funds. They issue the tickets and they are then chargeable to an account in the Department of State. So, she was offered the opportunity." The court, having in mind the teaching of Government of the Virgin Islands v. Aqui-

1. The motion also alleged that defendant through his attorneys had attempted to persuade Shine to change her story and had continuously harassed her with phone calls. No evidence of such actions was forthcoming from Shine at the time of her deposition, or appears of record.

*no*, 378 F.2d 540 (3d Cir. 1967) (that the government must show diligent effort to obtain the presence of a witness), and obviously believing that an offer had been made to pay Shine's expenses, reasoned that the mere fact that a witness was a foreign national was insufficient to establish unavailability; and that, when the liberty of a defendant is at stake, "the Government must show genuine and bonafide efforts on its part. . . . This is why I kept on insisting with the Government whether an offer was made to the witness to pay her expenses and subsistence. I believe that in view of the evidence presented by the Government and the offer of proof by the Government to the effect that she was offered to be paid for her expenses and subsistence I believe the deposition is admissible."

The deposition was then admitted and the trial began, only to abort into a mistrial when a customs inspector, contrary to the understanding of all parties, testified that he learned from the computer that defendant had a smuggling violation. Two days later the retrial began. It began with the reading of the deposition. The story told by Shine was of bare bones, not much excess flesh. She had been living in London for several months with her family. She had met a man named Hugh, last name unknown, who had put her in touch with defendant. She had told Hugh she would like to go to Los Angeles but needed money so that a friend could come with her. Shine added that she would be willing to pay for the ticket. Three months later defendant began calling her. She knew there was a job for her, but did not know what kind of a job it was. Finally, on July 15, 1977, she was provided with tickets and flew to Los Angeles to take some kind of a job. Defendant met her and took her to a hotel. Four days later he had her tickets "changed" to Lima, Peru, and she learned that she was to pick up and body carry cocaine.

Both she and defendant travelled to Peru on the same plane and stayed in the same hotel, in different rooms, for one night. The next day she moved to the Sheraton Hotel and, following defendant's instructions, went to a shop next door where defendant awaited her, and picked up a package, bringing it back to her room where she and defendant subsequently packaged it in plastic bags. The following day she carried the bags under her girdle and flew to Curacao and San Juan.[2] She then told about being arrested in San Juan, being held from 8:30 a. m. to 4:30 p. m., and giving a statement.[3]

After the deposition was read, two customs inspectors described the events leading up to Shine's arrest. The computer responded positively to her name, the inspector describing the response in these words: "DEA information indicates subject and accompanying [*sic*] smuggled cocaine to the United States from Peru concealed in luggage or on person." She was tense, unresponsive, wore a large "muumuu" dress. Her luggage was searched, apparently without untoward result. Then she was subjected to a body search and the cocaine was discovered. At this point in the trial a stipulation, agreed upon by both the prosecutor and defense counsel in an appar-

**2.** She said that an earlier version of the cocaine pickup which she had given agents the night of her arrest (*see* n. 3, *infra*) was incorrect in saying that defendant was not at the shop when she picked up the package of cocaine and that she did not see him again until they boarded the aircraft.

**3.** In this statement Shine said that three or four months ago a man identifying himself as Josh, later identified as defendant, called her, saying that he had gotten her phone number from her friend Hugh, and asked if she wanted a job in the United States. When she answered affirmatively, he said he would send a round trip ticket between London and Los Angeles. After some months, during which she did not understand the reason for the delay, Josh called to say the ticket had been purchased, but did not tell her anything about the job. In Los Angeles defendant met Shine, told her he wanted her to body carry cocaine, and offered to pay her $3000. She flew to Lima, went to a shop near the Sheraton, picked up a package, returned to her room, and saw defendant the next day as she boarded the plane for Curacao. There they stayed in separate rooms. Then, on July 25, they were both arrested in San Juan.

ent effort to dispense with the testimony of the witness who had caused the mistrial, was presented by defense counsel. This was that a customs inspector would have testified that "He received information to the effect that Mr. Mann was the accomplice of Miss Joann Shine and that on that suspicion he retained him and Mr. Mann was subsequently arrested." After this a chemist testified and the prosecution rested.

The case for the defense, insofar as it is relevant to issues on appeal, may be briefly summarized. It began with stipulations that no narcotics were found on defendant; that computerized information given the customs inspectors includes information not only relating to a prior record but mere suspicion based on "profiles", e. g., observations of the manner in which tickets are bought; and that an agent had told the grand jury the version of the cocaine pickup which appeared in her statement (see n. 2, supra). Defendant then took the stand and disclaimed any acquaintance with Shine before meeting her by chance at the airplane ticket office in Los Angeles when he bought his ticket to Lima. His wife had parents in Lima. Although they had had a civil wedding, defendant was an Israeli citizen and he and his wife wished to have a Jewish ceremony. Defendant's trip to Lima was to try to arrange with his wife's family and a Rabbi for such a ceremony. He denied any connection with Shine's drug carrying activities. The defense concluded with testimony from defendant's wife and mother-in-law in which both corroborated defendant's story that his purpose in going to Lima was to arrange a Jewish wedding.

## I. The Deposition

We face two questions concerning the deposition. The first is whether it was appropriate to permit the government to take the deposition. The second is whether the deposition was properly admitted into evidence at the trial. The first turns on construction of Rule 15(a) of the Federal Rules of Criminal Procedure which reads:

"Whenever due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial, the court may upon motion of such party and notice to the parties order that testimony of such witness be taken by deposition . . . . If a witness is committed for failure to give bail to appear to testify at a trial or hearing, the court on written motion of the witness and upon notice to the parties may direct that his deposition be taken. After the deposition has been subscribed the court may discharge the witness."

We must decide whether this case presented "exceptional circumstances" and whether taking the deposition was "in the interest of justice". In reviewing the district court's decision we bear in mind that the language of the rule and prior case authority commit the decision to the discretion of the district court. E. g., United States v. Rosenstein, 474 F.2d 705, 715 (2nd Cir. 1973); United States v. Puchi, 441 F.2d 697, 701 (9th Cir. 1971). But the language of the rule suggests that the discretion is not broad and should be exercised carefully. Allowing depositions too freely would create the risks that parties would seek to use depositions as a discovery device in criminal cases, see, e. g., In re United States, 348 F.2d 624 (1st Cir. 1965), or would try to use depositions in lieu of live testimony at trial in contravention of the spirit of the Sixth Amendment, Barber v. Page, 390 U.S. 719, 721, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968). Our review of all the circumstances leads us to conclude that the court abused its discretion by granting the government's motion to depose.

Shine, the government's principal witness, was a juvenile foreign citizen who had been illegally imprisoned with adults since her apprehension at the airport. The court, on the government's motion, sought to ameliorate the injustice done her in the most expeditious manner possible. Thus the court dismissed the charges against her and allowed her to be deposed. It should have been clear to the court from the tenor of the government's motion that the government fully expected the witness, once her deposition had been taken, to leave

Puerto Rico for Australia, in all likelihood never to return. After she had given her deposition, the government, over defendant's objection, returned her passport and plane tickets which had been seized at the time of her arrest.

That the witness was a juvenile foreign national, and a mere transient desirous of returning home, was perhaps an unusual situation, but whether it constituted "exceptional circumstances . . . in the interest of justice" is a far more complex question. This calls for an overall weighing of justice to the witness, to the defendant, and, in some cases, to the public. Of these, the most important is the defendant's right of confrontation. Particularly was that so in the case at bar. The defendant was charged with a serious crime; the case against him was by no means clear, and was substantially, if not entirely, dependent upon the testimony of this witness, which, even a priori, might be thought not entirely invulnerable on cross-examination. As against this, the witness' claim to consideration was far short of overwhelming. True, she had mistakenly been incarcerated in the wrong prison, but this scarcely required the dismissal of the charges against her. True, too, she was a juvenile. But for one who had been voluntarily travelling all over the world, a further short absence from the bosom of her family could not be rated a calamity. Moreover, there was no indication of any personal hardship or necessity requiring the witness' presence elsewhere. Sufficient relief could have been offered the witness by placing her in lesser custody, or perhaps simply by supplying maintenance, and retaining her passport and tick-

et. The government could also have placed her under subpoena. *United States v. Germann,* 370 F.2d 1019, 1023 (2nd Cir. 1967). There is no suggestion that such possibilities were explored. Having in mind that it failed even to extract a promise from her to return for the trial, one could almost deduce that the government's sole interest was to obtain a deposition and let the future take care of itself.

Under these circumstances the government's motion to take the deposition should not have been granted. It was clear that the prime reason for the deposition was the impermissible one of clearing the way for this critical witness to leave the court's jurisdiction. It was improper to require the defendant to bear the brunt of the government's attempt to remedy for the witness the effects of the government's earlier mistake. In so deciding, however, we do not mean to suggest that courts should be fearful to exercise their proper fully informed discretion to allow a deposition.[4] When the question is close a court may allow a deposition in order to preserve a witness' testimony, leaving until trial the question of whether the deposition will be admitted as evidence.[5] At that time, if the witness proves unavailable, the court may have before it a more complete information base. F.R.Crim.P. 15(e) accords no presumption of admissibility simply because the deposition was taken. The party requesting the deposition cannot escape its burden of taking all reasonable steps to bring to trial a witness whose testimony the party chooses to present. And the major harm to the other party's interests does not

4. For instance, it may be that had the government released the witness without returning her passport and on condition that she stay in Puerto Rico, the court might have granted the deposition as a precautionary measure lest the witness slip away without government acquiescence.

5. Rule 15 was amended in 1975. Rule 15(a) previously began, "If it appears that a prospective witness may be unable to attend or prevented from attending a trial or hearing, that his testimony is material and that it is necessary to take his deposition in order to prevent a

failure of justice . . . ." Dropping the explicit requirement of unavailability from Rule 15(a) indicates that the inquiry is more properly confined to the decision whether to admit the deposition as evidence. One consequence is that the case law on when it was permissible to take a deposition, focussing on whether the prospective deponent would be available is no longer useful to us. *See, e. g., United States v. Rosenstein,* 474 F.2d 705 (2nd Cir. 1973); *United States v. Gonzalez,* 488 F.2d 833 (2nd Cir. 1973); *United States v. Puchi,* 441 F.2d 697 (9th Cir. 1971).

occur unless the deposition is admitted. Because the question of admissibility is so important and because we think it will more often be the point of contest, we will proceed to consider it.

F.R.Crim.P. 15(e) permits use of a deposition at trial "so far as otherwise admissible under the rules of evidence, . . . if the witness is unavailable, as unavailability is defined in Rule 804(a) of the Federal Rules of Evidence . . . ." Rule 804(a)(5) defines as unavailable a deponent if he "is absent from the hearing and the proponent of his statement has been unable to procure his attendance . . . by process or other reasonable means." Rule 804(a) also provides that "[a] declarant is not unavailable as a witness if his . . . absence is due to the procurement or wrongdoing of the proponent of his statement for the purpose of preventing the witness from attending or testifying."

■ Courts have consistently held that, pursuant to Rule 804(a)(5), the proponent must show at least a good faith effort to procure the witness' attendance. Even where the absent witness is beyond the court's jurisdiction, "the government must show diligent effort on its part to secure the [witness'] voluntary return to testify." *Government of the Virgin Islands v. Aquino*, 378 F.2d 540, 551 (3d Cir. 1967). Furthermore, the effort must be "genuine and bona fide". *Id.* at 552. *See also United States v. Mathis*, 550 F.2d 180 (4th Cir. 1976); *United States v. Lynch*, 163 U.S. App.D.C. 6, 18, 499 F.2d 1011, 1023 (1974). *Cf. Phillips v. Wyrick*, 558 F.2d 489, 494 (8th Cir. 1977) (requiring good faith effort as an aspect of the Sixth Amendment right to confrontation). In *Lynch* the court held that the admission of preliminary hearing testimony at trial was erroneous because the government had failed to show "a search exercised both in good faith and with reasonable diligence and care". 163 U.S.App.D.C. at 18, 499 F.2d at 1023. After detailing the efforts the police had made to find the witness on the day she was to testify, the court said, "It is difficult to believe that if the preliminary hearing testimony of this critical witness were not available, the prosecution would have abandoned its efforts at this point to locate [the witness] and concluded its case." *Id.* at 19, 499 F.2d at 1024.

■ Here the witness is vital to the government's case.[6] The government did not make as vigorous an attempt to secure the presence of the witness as it would have made if it did not have the prior recorded testimony. The language of Rule 804(a)(5) suggests that "other reasonable means" besides subpoenas must be tried before a witness can be found unavailable. This relatively high good faith standard cannot be satisfied by perfunctory efforts,[7] if the rule is not to sanction the government's procuring depositions of witnesses, especially shaky witnesses,[8] but then discourage attempts to bring the witness to trial so long as the government is satisfied with what is in the transcript.

■ Even confining our evaluation of the government's efforts to produce the witness

---

**6.** A lesser effort might be reasonable where the testimony goes to minor, collateral, or uncontested matters.

**7.** The telegram sent to Australia, for instance, invited the consular officer to do no more than secure "proof of her unavailability". Also, the prosecutor's explanation of the standard procedure for offering witnesses transportation expenses leaves some doubt as to whether this witness was ever informed of the availability of such funds.

**8.** The possible importance of having this witness appear in person is indicated by her having changed her story as to an important detail between the time she gave a statement and her deposition. She originally said that she had gone to a store and found the cocaine where appellant had said it would be. She later said that appellant handed the cocaine to her. *See* n.2, *supra*. The record of the deposition indicates that she was flustered when she gave the first statement. The extent to which she was flustered when explaining the inconsistency does not and cannot show on the cold record of the deposition. The witness' demeanor might also have been significant on cross-examination, had appellant been afforded that chance, when questioned about her story in light of the government's leniency toward her.

to the period immediately before trial, therefore, we might have trouble finding them sufficient. We need not limit our inquiry to that narrow time frame, however, because the government's burden included more than that it attempt to get the witness to return from Australia. Here the problem arose only because the government abused Rule 15(a) by using it to enable the key witness to leave Puerto Rico. This misuse directly made possible the witness' later absence on which the government seeks to rely to establish her unavailability within the meaning of Rule 804(a). Implicit, however, in the duty to use reasonable means to procure the presence of an absent witness is the duty to use reasonable means to prevent a present witness from becoming absent. As we have already said, in this case the government had such means at its disposal but did not choose to use them. The defendant should not suffer the injury from the government's choice. On this independent basis we would find that the government failed to demonstrate that the witness was unavailable. Therefore, it was error to admit the deposition. Given the importance of the deposition to the government's case, the error was clearly prejudicial. See United States v. Simuel, 439 F.2d 687, 689 (4th Cir. 1971). Defendant's conviction must be set aside.

Because a new trial would be possible if the government can convince Shine to return from Australia or has sufficient independent evidence, we will proceed to decide the other issues presented for our review.

## II. "Other Acts" Evidence

A second issue arises out of eliciting, over objection, during cross-examination testimony from defendant that in 1976 a recent male acquaintance had been arrested in the Bahamas in defendant's presence and found to be carrying cocaine in a suitcase. Defendant, after being questioned, had been released. The questions raised by the admission of this evidence are (1) whether it is relevant under Rule 401 of the Federal Rules of Evidence;[9] (2) whether, if relevant, its probative value is outweighed by the danger of prejudice under Rule 403;[10] and (3) whether it falls within the purpose of the "Other crimes . . . or acts" provision, Rule 404(b).[11]

We have addressed the delicate balancing task faced by the district court, in a number of cases both before and after the Federal Rules of Evidence became effective.[12] In all cases cited in the margin we have upheld the admissibility of such evidence, as being within the proper discretion of the trial court, except for United States v. Fosher, 568 F.2d 207 (1st Cir. 1978), where we found the relevance of a police photograph outweighed by the probable prejudice. In this appeal, we face serious questions of both relevance and prejudice. The facts necessary for our analysis can be stated briefly.

In cross-examination, the prosecutor asked defendant about a trip to Peru which he had said he had taken in 1976 to visit his

9. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

10. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

11. "Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other pur-

poses, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

12. See, e. g., United States v. Mehtala, 578 F.2d 6, 9 (1st Cir. 1978); United States v. Wright, 573 F.2d 681, 683 (1st Cir. 1978); United States v. Fosher, 568 F.2d 207 (1st Cir. 1978); United States v. Barrett, 539 F.2d 244, 248–49 (1st Cir. 1976); United States v. Eatherton, 519 F.2d 603, 611 (1st Cir. 1975); United States v. Hopkinson, 492 F.2d 1041, 1043 (1st Cir. 1974); New England Enterprises, Inc. v. United States, 400 F.2d 58, 70 (1st Cir. 1968); Dirring v. United States, 328 F.2d 513, 514–15 (1st Cir. 1964); Green v. United States, 176 F.2d 541, 543–44 (1st Cir. 1949).

wife, then his girl friend. Defendant had returned to the United States via Curacao and the Bahamas. At this juncture defense counsel objected to any further questions specifically related to the Bahamas, saying that defendant had been arrested on suspicion of complicity with another man whose suitcase contained cocaine and who ultimately pleaded guilty to a charge of importation. Defendant had been released. The prosecutor argued that the fact that in 1976 defendant had gone to visit his wife ("Every time it is his wife.") and that he was with someone who was found carrying drugs "is too much coincidence". Defense counsel replied that this evidence did not rise to a pattern or a scheme and would be very prejudicial. The prosecutor rejoined: "I can ask him whether he had the same trouble before that. That doesn't mean that I am implicating. He was arrested because of the same type of parade." The court overruled the objection and also defendant's immediate motion for reconsideration. The prosecutor then asked if defendant had travelled from Peru to the Bahamas with someone carrying drugs. Defendant said that he had not travelled with such a person, but had come with someone else from Peru to the Bahamas where he met the person later arrested for carrying drugs in his suitcase. Both he and the other person had Israeli passports. Defendant said he had been questioned but not detained.

In closing argument the prosecutor referred to this testimony, without objection, as follows: "See if this man is not a man with the worse [sic] luck in the world. In 1976 when he goes to see his girlfriend who he has been corresponding for two years and don't even know her address . . . . [I]t just so happens that on that little trip that only took two or three days this man runs into the same type of trouble as before. [T]he people who are travelling on the airplane who he casually knows also gets caught with cocaine. Consider that, a coincidence, a year before. That is quite a coincidence. Maybe he should be playing the lottery. He wins every time. How many times have you travelled that you

have had that happen to you and at that time there was no Lyndel Shine around."

It is immediately apparent, at least in the hindsight of a reviewing court, that when we look for a logical nexus between the Bahamas incident and the crime for which defendant was being tried there is less here than meets the eye. Often the relevance of a piece of evidence is so obvious that a judge need spend no effort in justifying his ruling. But in doubtful cases, the following is prudent advice:

> "Where relevancy is not immediately apparent, the judge and counsel should clearly identify the terms of the relevancy relationship in the particular case. That is, they should describe the item of evidence being proffered, the consequential fact to which it is directed, and the hypothesis required to infer the consequential fact from the evidence. Without this analysis it is impossible to decide how the evidence may alter the probability of the existence of the consequential fact." 1 Weinstein's Evidence, ¶ 401[08], pp. 401–30.

█ Here, the proffered evidence is that A, an Israeli citizen not carrying any contraband, was with a recent acquaintance, B, an adult Israeli man travelling alone, when B was arrested for carrying cocaine in a suitcase from some unknown point of origin into the United States via the Bahamas in 1976. The consequential facts that this incident is meant to help establish are that A paid C, a teen-age Australian woman travelling with him, to carry cocaine in her girdle from Peru to San Juan in 1977. To make the logical connection one must infer (despite the lapse in time, the different routes, and the substantially different methods of operation) that A was involved with each smuggling operation and that his involvement with the earlier one makes his participation in the later one more likely.

Laying the proffered evidence and the hypothesis side-by-side exposes nothing to make more probable the alleged conspiratorial master-and-mule relationship between defendant and Shine. That defendant was

talking to a fellow citizen in a foreign airport gives little reason to believe that he knew what the other person was carrying or that he was in any way participating in smuggling. If defendant were involved in that operation, we should think he would not have chosen the moment of maximum risk to rejoin the man carrying the contraband. Even if he were involved in the former escapade, the only points of similarity between it and the later one are that someone else was carrying cocaine at the same time defendant was coming from Peru. A coincidence it may be, but proof that defendant's second trip to Peru was not innocent it is not. Indeed, to say that what is at most a coincidence—a concurrence of events without apparent causal relation—is, as the prosecutor would have it, "too much coincidence" comes close to reading the word out of the lexicon. We assume that the vast majority of people flying from Peru towards the United States are not carrying cocaine and yet, perhaps, many of them pass through an airport at the same time as a smuggler. That defendant had done so once does not alter the probability of his doing so again a second time without knowledge, whether or not he was innocent the first time.

The prosecution, in its brief, argues, first, that evidence of the 1976 trip to Peru showed "a plan in using the same method of operation"—but the identity or similarity of method, as we have indicated, does not stand analysis. A second attempted justification is that the evidence was admissible as impeaching defendant's story that he went to Lima to see his wife; but being in the Bahamas after seeing his wife in Peru hardly seems self-contradictory. Finally, the government tries to justify its cross-examination by saying that counsel had assumed that defendant and the acquaintance had travelled together from Peru. But this does not excuse the prosecutor's insistence, after realizing his mistake, in hammering home innuendo in his closing argument. That defense counsel did not then object is understandable; he had lost his fight to keep out the evidence and there was no basis for his thinking that the court could change its mind.

In *United States v. Mehtala,* 578 F.2d 6 (1st Cir. 1978), we reached the verge of relevancy; in this case we breach the bounds. A case presenting much the same attempt at reasoning is *United States v. Vosper,* 493 F.2d 433 (5th Cir. 1974). In that case, a prosecution for bank robbery, the prosecution elicited testimony that on the day before the robbery the same robber involved in the case at bar had robbed a finance company nearby and that the defendant was seen a block and half from the scene, just as he was seen on the occasion of the robbery in the case at bar. The argument of the prosecutor is reminiscent of that made to the court below: "The similarity of the two events was, so the government argued, to negate Vosper's claim of innocence with coincidences that were just *too* coincidental." 493 F.2d at 437 (emphasis in original).

Although the district court in *Vosper* gave an instruction limiting the evidence of the prior robbery to the issue of defendant's intent (a precaution not taken in the case at bar), the court of appeals held that "There is little, save [defendant's] presence (and Lynn as the robber thereto), to show that he had any responsibility for or participation in the [present] incident." *Id.* The court went on to hold that the danger of prejudice outweighed any value the evidence might have—the prejudice being that the jury might feel not only that defendant "was a law breaker, but that he ran with other such law breakers." *Id.*

So here. Not only do we feel that there was a lack of any rational connection between the Bahamas incident and the crime charged here but that if there was any relevance, it was heavily outweighed by the potential for prejudice. We can well imagine jurors being unimpressed by the narrative of both Shine and defendant; in such a position of equilibrium, jurors might well find the scales tipped by the knowledge that defendant had had a close call a year ago.

The irony is that this kind of evidence probably did not add significantly to the

prosecution's case. The prosecution argued the implications with some restraint and the defense made a persuasive counterattack. But we cannot quite say that this was harmless error. This is, therefore, an alternative and independent ground for setting aside the conviction.

### III. Other Asserted Errors

■ Defendant claims that the government, during cross-examination, pursued an "argumentative, misleading, and improper" line of questioning concerning defendant's alleged assertion of his Fifth Amendment right to remain silent at the time of his arrest and at arraignment before a magistrate. Defendant suggests that because he remained silent at those times, it was improper for the prosecution to question him about why he had not laid out his defense. Therefore, defendant concludes, his attorney rendered ineffective assistance by not objecting to the line of questioning and, in any case, plain error was committed. Appellant's argument must fail, however, because his premise is faulty. The record shows that he did not assert his right to remain silent. Rather, when asked if he had told anyone his defense, he replied, "I think the agent who picked me up from the airport in the DEA office, he came, he just didn't hear the whole story." When asked why he had not told the magistrate, he said, "I told the Magistrate." Since he had not asserted his right to remain silent, the prosecutor had every right to question him about what he had and had not said. *United ed States v. Goldman*, 563 F.2d 501, 503 (1st Cir. 1977); *Vitali v. United States*, 383 F.2d 121, 123 (1st Cir. 1977). There was no reason for appellant's attorney to object, and no error was committed.

■ Evidence of information obtained from a computer by the customs inspectors about both Shine and defendant is challenged on appeal as hearsay. The reading on Shine reported information indicating that she and "accompanying smuggled co-

caine . . . concealed in luggage or on person"; that on defendant, the result of contributions from various agencies based on prior records or profiles, reported him as the accomplice of Shine. The district court was appropriately solicitous of defendant. It declared a mistrial because of the testimony of one stubbornly errant witness. It took the position that the computer's information was usable only as being the basis for suspecting defendant.[13] The information as to Shine came in at the retrial without objection; that as to defendant was stipulated, the substance of the stipulation being conveyed to the jury by defense counsel. Defendant's present argument that the district court's rulings at the mistrial two days earlier made objection unnecessary cannot be accepted; a rule that one objection preserves an issue during any retrials would make the domain of a trial judge more of a mine field than ever. We find no plain error.

■ Finally defendant argues that his counsel was ineffective. Even though we have recently clarified our standard, abandoning the "farce and mockery" banner, *United States v. Bosch*, 584 F.2d 1113 (1st Cir. 1978), this does not help defendant. Indeed defendant seems not to need any more help at this juncture. We are setting aside his conviction on two grounds, as to each of which counsel made vigorous and timely objection. There is no basis for declaring defendant deprived of the effective assistance of counsel.

*The judgments are vacated and the case remanded to the district court for further proceedings.*

---

13. We note that the agent's suspicions would be relevant were the legality of defendant's arrest at issue, but we do not see the relevance to defendant's guilt or innocence on this charge.