47 F.3d 1170
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Arthur TATE, Warden, Respondent-Appellant,
v.
Timothy FLENOY, Petitioner-Appellee.
 Nos. 93-4165, 93-4204.
 United States Court of Appeals, Sixth Circuit.
 Jan. 24, 1995.
 
 Before: MILBURN, BOGGS, and NORRIS, Circuit Judges.
 PER CURIAM.
 
 
 1
 This case comes to us after the district court granted a writ of habeas corpus to petitioner Timothy Flenoy. Flenoy was convicted in Ohio state court of one count of murder after a retrial that ended in March 1989. He petitioned for a writ of habeas corpus on eleven grounds. A magistrate judge made a report and recommendation finding that the state trial court had violated Flenoy's Sixth Amendment right of confrontation when it allowed the prosecutor to read into the record testimony given at Flenoy's first trial by two absent witnesses (Camille Deal, a/k/a Camille Miller, and Rosa Hempstead). Specifically, the court found that the witnesses were not truly unavailable because the prosecution's efforts to locate Deal and Hempstead were not sufficiently diligent. The magistrate judge also recommended holding that Flenoy's other ten grounds were meritless.
 
 
 2
 The district court adopted the report and recommendation, and on August 30, 1993, ordered that the writ be granted unless the State elected to retry Flenoy within 120 days of the order. Warden Tate timely appeals the grant of habeas corpus, arguing that the district court erred in finding a lack of good faith. Flenoy cross-appeals the denial of his request for habeas relief on eight additional grounds. On November 30, 1993, the case was stayed pending resolution of the appeal. We now affirm the judgment of the district court.
 
 
 3
 * Timothy Flenoy, his brother Kevin, Derrick Henderson, and Raymond Collins encountered and harassed Evans Miller at a BBQ store. The store owner called Miller's common-law wife, Camille Deal, and told her four men were arguing with Miller. She came to the BBQ store, where she found the four harassing Miller.
 
 
 4
 When Miller and Deal left to walk home, Collins followed them on foot, taunting and pushing them, while the others followed in a black-and-white Cadillac. As the couple neared Miller's home, Collins continued to taunt him. Timothy Flenoy stood next to a brick building a few houses from Miller's, armed with a rifle; Kevin Flenoy and Henderson had guns as well. Miller insisted that he did not want to fight, but Collins persisted in harassing him from the end of Miller's driveway. When Deal saw that the other men were armed, she handed Miller a single-shot shotgun. According to Rosa Hempstead, an eyewitness to the shooting, Miller twice told the men: "I don't want to fight you." Collins then walked toward the brick building. Subsequently, a number of shots were fired from the direction of the building. Miller was struck twice and died. Flenoy was arrested later that night while driving a black-and-white Cadillac.
 
 
 5
 Flenoy was charged with murder. At the first trial, Collin's mother and grandmother testified that Flenoy was nowhere near the Miller residence because they saw him at the BBQ store at the time of the shooting. Their testimony was refuted by Camille Deal and Rosa Hempstead. (Deal and Hempstead also testified at the trial of Raymond Collins.) The jury found Flenoy guilty, but he was later granted federal habeas corpus relief because of a defective jury instruction. The state elected to retry him. On August 31, 1988, the state court set a retrial date of December 19, 1988.
 
 
 6
 On December 19, 1988, the court granted a continuance because of the state's inability to locate Deal or Hempstead. The trial was delayed until Monday, February 27, 1989, when the prosecution told the court that Deal and Hempstead had not been found. On February 28, the prosecution asked the court to admit the witnesses' prior testimony pursuant to Rule 804 of the Ohio Rules of Evidence;[1] defense counsel duly objected.
 
 
 7
 The prosecutor explained[2] at trial that the state had attempted to call the witnesses, but that Deal had no telephone and they "could never get an answer" at Hempstead's. Subpoenas were sent at various times, but both Deal and Hempstead had changed addresses since the first trial. The prosecution acknowledged that the "first contact," apparently a reference to personal efforts to contact the witnesses, occurred on Tuesday, February 7. Detective Murphy "made personal efforts, along with subpoenas, to serve these persons and to locate them." He discovered, "through efforts of welfare," that Deal's address was 8926 Laisy. Murphy went to the address on Laisy but found nobody was home, so he left a card in one of the mailboxes asking Deal to contact him or the prosecutor. Upon receiving no response, he returned a week later and again left a card. Finally, on the Friday before trial, February 24, he returned and spoke with a babysitter who was staying downstairs. She told him that it was a three-family home and that a Camille Deal did not live there. Detective Murphy explained that Deal's welfare checks were coming to this address, but the sitter insisted that Deal did not live there.
 
 
 8
 On February 7, Detective Murphy also went to Hempstead's home. A young girl, nine years old by his estimate, told him that her mother was out of the country and her father would be home later. He left his card and asked her to tell her father to call him. That afternoon, Mr. Hempstead called and told Murphy that his wife was out of the country on a singing tour and would not be back for five or six weeks. Murphy told him that the trial was on the 27th, and Mr. Hempstead said that if his wife returned, he would inform her of that fact. Finally, the prosecution sent an investigator to serve subpoenas at both addresses on Friday, February 24, with no success. Murphy also attempted to serve subpoenas that day.
 
 
 9
 Over defense counsel's objections, the trial court allowed the prosecutor to read into the record the testimony of Deal and Hempstead from the first trial. The jury found Flenoy guilty of murder.
 
 II
 
 10
 An appellate court reviews de novo a district court's grant of a writ of habeas corpus, Serra v. Michigan Dep't of Corrections, 4 F.3d 1348, 1350 (6th Cir. 1993), cert. denied, 114 S. Ct. 1317 (1994), and the district court's factual findings are reviewed for clear error. McCall v. Dutton, 863 F.2d 454, 459 (6th Cir. 1988), cert. denied, 490 U.S. 1020 (1989). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). "This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." Anderson v. Bessemer City, 470 U.S. 564, 573 (1985).
 
 
 11
 Courts have differed over whether the existence of good faith and reasonable efforts is a mixed question of fact and law that warrants de novo review, or a factual matter so that a district court's findings will be respected unless clearly erroneous. Compare Martinez v. Sullivan, 881 F.2d 921, 926 (10th Cir. 1989) (holding that ultimate issue of unavailability and good faith efforts is mixed question), cert. denied, 493 U.S. 1029 (1990) and Dres v. Campoy, 784 F.2d 996, 998 (9th Cir. 1986) (reviewing de novo whether Supreme Court standards for unavailability have been satisfied) with Carter v. Sowders, 5 F.3d 975, 978 (6th Cir. 1993) (treating unavailability as a factual determination and reviewing for clear error), cert. denied, 114 S. Ct. 1867 (1994) and Mramor v. McMackin, No. 88-3124, 1988 WL 137334 (6th Cir. Dec. 23, 1988) (employing the "clearly erroneous" standard without discussion), cert. denied, 493 U.S. 828 (1989). This circuit has never directly addressed the issue.
 
 
 12
 Because the issue of reasonableness is essentially a factual question, we conclude that the deference owed to factual findings of the district court also applies to questions of reasonableness and good faith. Federal Rule of Civil Procedure 52(a) states that "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."[3] The Supreme Court in Bessemer City made clear that district courts are entitled to deference even where they lack an opportunity to assess credibility:
 
 
 13
 The rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility. The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources. In addition, the parties ... have already been forced to concentrate their energies and resources on persuading the trial judge that their account of the facts is the correct one; requiring them to persuade three more judges at the appellate level is requiring too much.
 
 
 14
 Bessemer City, 470 U.S. at 574-75. Accordingly, deference is appropriate "even when the district court's findings ... are based instead on physical or documentary evidence or inferences from other facts." Id. at 574. The district court's conclusion that the prosecution's efforts to locate Deal and Hempstead were unreasonable and evinced a lack of good faith and diligence falls squarely into this class of factual determinations.
 
 
 15
 The circuits that have applied de novo review have done so after concluding that unavailability more closely resembles a mixed determination than a purely factual assessment. However, the Supreme Court has frequently noted that the line between fact and law has never been satisfactorily delineated. Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 401 (1990); Pullman-Standard v. Swint, 456 U.S. 273, 288 (1982) ("Rule 52 (a) does not furnish particular guidance with respect to distinguishing between law and fact. Nor do we yet know of any other rule or principle that will unerringly distinguish a factual finding from a legal conclusion.").
 
 
 16
 Even the conclusion that an issue is a mixed question of law and fact does not automatically justify non-deferential review. There are mixed questions where the applicable legal standard is a factual test, such as a person's state of mind or negligence. See Pullman-Standard, 456 U.S. at 289-90 (reviewing "actual motive" to discriminate under "clearly erroneous" standard); Commissioner v. Duberstein, 363 U.S. 278, 289-91 (1960) (intent to make a gift); Hasbro Indus., Inc. v. M/S "St. Constantine", 705 F.2d 339, 341 (9th Cir.) (negligence), cert. denied, 464 U.S. 1013 (1983). "[D]eferential review of mixed questions of law and fact is warranted when it appears that the district court is 'better positioned' than the appellate court to decide the issue in question or that probing appellate scrutiny will not contribute to the clarity of legal doctrine." Salve Regina College v. Russell, 499 U.S. 225, 233 (1991) (emphasis added). Further, with Rule 52(a), Congress and the Supreme Court have "articulated a standard of deference for appellate review of district court determinations [that] reflect[s] an accommodation of the respective institutional advantages of trial and appellate courts." Id. at 233.
 
 
 17
 The holding in Sumner v. Mata, 455 U.S. 591 (1982), that 28 U.S.C. Sec.2254(d) requires a federal court to defer to the factual findings of a state court is not inconsistent with our rule. Section 2254(d) applies to "basic, primary, or historical facts: facts 'in the sense of a recital of external events and the credibility of their narrators ....,"' Cuyler v. Sullivan, 446 U.S. 335, 342 (1980) (quoting Townsend v. Sain, 372 U.S. 293, 309 n.6 (1963)), and does not prevent a federal court from reviewing de novo "a mixed determination of fact and law that requires the application of legal principles to the historical facts of this case." Id. at 342. The dispute in this case is not the identity of the essential facts, but instead the legal significance to attach to them. See, e.g., Cuyler, 446 U.S. at 342 (whether lawyers undertook multiple representations was not a factual question governed by Sec. 2254(d)); Brewer v. Williams, 430 U.S. 387, 395-97 (1977) (whether defendant waived his right to counsel not within scope of Sec. 2254(d)).
 
 
 18
 This case is a paradigmatic example of where a judicial "second opinion" would not advance the "clarity of legal doctrine." Questions of reasonable diligence and good-faith effort, while admittedly not grounded exclusively in fact, require a detailed factual inquiry and the drawing of inferences. A federal district court is as familiar with the issues and litigants as a federal appellate court, and thus fully able to marshal the pertinent facts and apply a fact-dependent legal standard. See Cooter & Gell, 496 U.S. at 402. Deferential review provides flexibility to resolve questions involving "'multifarious ... narrow facts that utterly resist generalization,' ... the consideration of unique factors ... 'fact-intensive, close calls."' Id. at 404 (citations omitted). Fact-laden inquiries are especially time-consuming, so that the duplicative assessment of facts by an appellate court would squander judicial resources, ignoring the counsel of Bessemer City, without contributing a countervailing benefit of enhanced accuracy or fairness. Moreover, an appellate court remains capable of supervising a lower court's improper selection or interpretation of a legal standard under a de novo review, and may continue to correct instances of clear error.
 
 III
 
 19
 In Mancusi v. Stubbs, 408 U.S. 204 (1972), the Supreme Court articulated a two-part test for determining when a declarant's out-of-court statement is admissible under the Confrontation Clause. The prosecution must first demonstrate the unavailability of the witness whose testimony it seeks to use against a defendant. Id. at 210-11. Once a witness is shown to be unavailable, the court must decide whether the statement possesses sufficient "indicia of reliability" to afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement. Id. at 213. Reliability can be inferred "where the evidence falls within a firmly rooted hearsay exception," or is accompanied by "particularized guarantees of trustworthiness." Ohio v. Roberts, 448 U.S. 56, 66 (1980).
 
 
 20
 "[A] witness is not 'unavailable' for purposes of the foregoing exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." Barber v. Page, 390 U.S. 719, 724 (1968). Accord Roberts, 448 U.S. at 74; California v. Green, 399 U.S. 149, 161-62, 165, 167 n. 16 (1970).
 
 
 21
 The Court further refined the "good faith" standard in Roberts:
 
 
 22
 The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists ... "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith may demand their effectuation. "The lengths to which the prosecution must go to produce a witness ... is a question of reasonableness." The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness. As with other evidentiary proponents, the prosecution bears the burden of establishing this predicate.
 
 
 23
 Roberts, 448 U.S. 74-75 (second emphasis added) (citations omitted). The government must attempt to locate absent witnesses as vigorously as if it lacked their prior recorded testimony. United States v. Mann, 590 F.2d 361, 367 (1st Cir. 1978).
 
 
 24
 Although the district court never addressed the second part of the Roberts test because the prosecution had not met its initial burden, Deal's and Hempstead's prior statements are reliable because they arose in a trial where defense counsel was able to cross-examine both witnesses. See Mancusi, 408 U.S. at 213-14. Therefore the dispositive issue is whether the prosecution met the Roberts requirement of undertaking reasonable, good faith efforts to locate Deal and Hempstead.
 
 IV
 
 25
 A brief examination of several Supreme Court and Sixth Circuit decisions will help delineate the standard for what constitutes reasonable, good faith efforts. In the Roberts case, a witness was deemed unavailable in the constitutional sense where the prosecution contacted a witness's mother four months before the trial date, issued five subpoenas over several months, and conducted a voir dire of her parents, who testified that they had no way to reach their daughter, even in an emergency. 448 U.S. at 75. Although the Supreme Court held that the state "did not breach its duty of good-faith effort," it appeared to be more impressed by evidence that a search would be futile[4] than by the diligence of the prosecution. Id. at 75-76.
 
 
 26
 Although the Court focused on the reliability of the absent witness's prior testimony in Mancusi v. Stubbs, it also criticized the lower court for summarily granting habeas relief on the grounds that the state had made no efforts to obtain the presence of a witness who was then a resident of Sweden. 408 U.S. at 210-12. The Court noted that while legal procedures existed for procuring witnesses from different states, getting a witness from a foreign country was much more difficult, so that "the State of Tennessee ... was powerless to compel his attendance at the second trial." Id. at 212. The Court also distinguished Barber v. Page, where "the State made absolutely no effort to obtain the presence [of the witness] other than to ascertain that he was in federal prison outside Oklahoma." Id. at 210 (quoting Barber, 390 U.S. at 723). The Court discounted the prosecution's argument in Barber that "because the process of the trial Court is of no force without the jurisdiction ... the party desiring his testimony is therefore helpless." Ibid. (citation omitted).
 
 
 27
 The Sixth Circuit affirmed lower court findings of good faith in Mramor v. McMackin, No. 88-3124, 1988 WL 137334 (6th Cir. Dec. 23, 1988), cert. denied, 493 U.S. 828 (1989), and Glenn v. Dallman, 635 F.2d 1183 (1980), cert. denied, 454 U.S. 843 (1981). In Mramor, a co-defendant, Bacsa, had agreed to testify in exchange for immunity. 1988 WL at * 3. Prior to the trial, he moved to Louisiana, unbeknownst to his attorney, the police, or prosecutors. Ibid. Inquiries were made "in his neighborhood, at the sheriff's office, post office, phone company, etc." Bacsa was found only after Ohio police issued an arrest warrant for obstruction of justice; Louisiana police then notified Ohio authorities that they had incarcerated Bacsa. The court of appeals affirmed because the lower court's finding that Bacsa was unavailable was not clearly erroneous. Ibid.
 
 
 28
 In Glenn, a witness to a burglary told her roommate that she was going to California and left without leaving a forwarding address or making any later contact. 635 F.2d at 1185. The detective assigned to the case interviewed the roommate and neighbors, as well as checking several times at the Post Office for a forwarding address. Id. at 1185-86. The court found these efforts sufficient:
 
 
 29
 It may be theorized that law enforcement efforts should have made to locate [the witness] in California. This case, however, appears to fall within the language of the Supreme Court in Roberts that " ... the great improbability that such efforts would have resulted in locating the witness, and would have led to her production at trial neutralizes any intimation that a concept of reasonableness required their execution." Id. at 2544.
 
 
 30
 Glenn, 635 F.2d at 1186.
 
 
 31
 Our circuit was more demanding in United States v. Quinn, 901 F.2d 522 (6th Cir. 1990), where we reversed a lower court's finding of good faith. The government in Quinn needed the testimony of the defendant's girlfriend in a drug trial, but issued a subpoena for her only on the Wednesday before a Monday trial; the marshal sent to locate the witness testified that the federal marshals "like at least five working days" to serve subpoenas. Id. at 524. He went to the address given by the witness at a prior hearing and pounded on a window, but nobody appeared to be home. The marshal returned Friday and "beat the door fairly hard" and left a United States Marshal sticker on the front door. Id. at 524-25. After taking no action over the weekend, he returned on Monday and was told the witness had moved a month ago. Id. at 528. He discovered that evening that the witness was at her mother's home, so he drove by the house to check for the witness's car. Ibid. He called the house the next day and spoke to the mother, who informed him that the witness was "in and out of the house." Id. at 525.
 
 
 32
 The court characterized these efforts as "singularly unenthusiastic," faulting the state for not checking city or county records, not asking the apartment manager for a forwarding address, and not speaking with employers or relatives. Id. at 528. The court "stress[ed] the importance of the jury's opportunity to assess the demeanor of this particular witness," due to her suspect status as the defendant's girlfriend. Id. at 529. The court further noted the witness's value to the prosecution: "Confrontation Clause considerations 'are especially cogent when the testimony of a witness is critical to the prosecution's case against the defendant."' Ibid. (quoting United States v. Lynch, 499 F.2d 1011, 1022 (D.C. Cir. 1974)).
 
 V
 
 33
 The district court faulted the police and prosecution for waiting until two weeks before the retrial to begin looking for their witnesses; for relying on the statements of a baby sitter; for not attempting to make any contact with Hempstead overseas or requesting that she return. In passing, the district court noted: "It seems likely, given the crucial nature of their testimony, that the government definitely would have put forth a more 'vigorous' effort if prior testimony was unavailable." In particular, the district court seemed to weigh heavily that the state only began its efforts to find the two witnesses on February 7, even though it had received the continuance six weeks earlier. The state argues that the court should scrutinize only the efforts taken by the prosecutors once they started looking for the witnesses.
 
 
 34
 The law does not support the state's cramped definition of unavailability. The only possible limitation is that the court might examine only efforts made prior to trial, although some courts have also considered efforts made during the course of a trial. See Quinn, 901 F.2d at 528 (citing Roberts, 448 U.S. at 74). A proper inquiry into reasonable, good faith efforts requires a court to look at all the facts, including when the government initiated efforts to contact absent witnesses. After a thorough review of the facts of this case, we agree that the government's efforts did not constitute good faith and were not sufficiently diligent.
 
 
 35
 The attitude of the prosecutors and Murphy was laissez-faire at best, and falls closer to the Quinn side of the diligence spectrum. The prosecution admits waiting six weeks before actually sending anyone to try to locate Deal or Hempstead. When Detective Murphy finally went looking for witnesses, he simply left a card for Deal and a message with a nine-year-old for Hempstead's husband. These acts are akin to the "knock-loudly-and-leave-a-sticker" approach found lacking in Quinn. Murphy then merely waited for a phone call, fortunately receiving one from Mr. Hempstead. He did not try to determine if Mrs. Hempstead could be contacted overseas, nor did he ask her husband to do so. Such a premature cessation of efforts is similar to the failure of authorities in Barber to try to contact a witness who was imprisoned in an Oklahoma prison.
 
 
 36
 Particularly telling is that after the initial stop at Deal's "welfare address," Murphy returned on the 14th, and then did nothing for two weeks until the Friday before a Monday morning trial. Murphy's leaving his card in a mailbox that he has already been told is not Deal's can hardly be considered diligent; police would generally exhibit more zeal in seeking witnesses (or finding criminals) for a first trial.
 
 
 37
 Unlike the circumstances in Roberts and Glenn, the prosecution's initial diligence did not reveal that further investigation would be futile: Murphy never tried to contact Hempstead abroad, or even ask where she was (there is, after all, quite a difference between locating a witness in Canada and Kathmandu). Upon receiving no response to a card left at Deal's welfare address, he ignored what a babysitter told him and returned a week later. He then did nothing else until one working day before trial.
 
 
 38
 The state also attempts to create a post hoc futility argument from Flenoy's failure to assist the state in its search for Deal. Flenoy's counsel told the trial court that, according to Flenoy's brother Kevin, Deal had moved from her listed address to a residence "off of 79th and Avon," and that she wanted no involvement with the retrial. The state contends that "while one could suggest a number of ways in which [Murphy] could have tried to verify that Deal did not live [on Laisy] ... Flenoy himself established that such efforts would have been futile." Yet the police do not claim that they failed to seek out Deal diligently because they knew of her reluctance to testify; facts unknown to them cannot have motivated their actions. Further, there is no legal support for a rule that a criminal defendant must assist the prosecution in acquiring adverse witnesses -- that duty is squarely upon the state. Aside from Fifth Amendment questions, such a proposition would shift the burden of showing unavailability to the defendant, contrary to Roberts. Indeed, the fact that someone living in the same town, known to at least some persons involved in the case, knew Deal's location is strong evidence that other avenues of inquiry might not have been futile.
 
 
 39
 We hold that the district court properly concluded that any error was not harmless because of the crucial nature of both Deal's and Hempstead's testimony.[5] In order to be considered harmless, the constitutional error must have had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 113 S. Ct. 1710 (1993). Neither party has suggested that testimony linking Flenoy to the scene of the crime was anything but critical; that is undoubtedly one reason why the state needed Deal's and Hempstead's prior statements when they could not be found for the retrial. Flenoy offered two witnesses who testified that he was at the BBQ store when Evans Miller was shot. Even if this testimony was only marginally credible, a jury might have believed it in the absence of contrary evidence. The testimony of Deal and Hempstead placing Flenoy at the crime scene was pivotal in convicting him for murder.
 
 VI
 
 40
 Because the district court was not clearly erroneous in finding that the prosecution had not met its burden of showing reasonable, good faith efforts to locate its witnesses, it is unnecessary to address Flenoy's alternative claims of error. We therefore AFFIRM the district court's judgment.
 
 
 
 [1]
 Hearsay exceptions; declarant unavailable
 (A) Definition of unavailability.
 "Unavailability of a witness" includes situations in which the declarant ... (5) is absent from the hearing and the proponent of his statement has been unable to procure his attendance ... by process or other reasonable means.
 * * *
 (B) Hearsay exceptions.
 The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
 (1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding ... if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination....
 Ohio R. Evid. 804 (Baldwin 1991).
 
 
 [2]
 The magistrate judge was concerned that the statements of the prosecutor and Detective Murphy to the state trial court were not under oath. Neither the magistrate judge nor the district court engaged in additional factfinding, instead relying on the transcript of the retrial and other documentary evidence
 
 
 [3]
 Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts provides: "The Federal Rules of Civil Procedure, to the extent that they are not inconsistent with these rules, may be applied, when appropriate, to petitions filed under these rules." 28 U.S.C. Sec. 2254
 
 
 [4]
 A year prior to the trial, a social worker in San Francisco called the parents about a welfare application; they had last heard from the witness seven or eight months before the trial, when she told them she was travelling outside the state, leaving no address. Roberts, 448 U.S. at 59-60
 
 
 [5]
 Appellant's counsel stated for the first time at oral argument that one of the witnesses has recently died. This fact does not alter our analysis nor render habeas relief inappropriate. Whatever effect this new circumstance might have on a possible retrial is not relevant to the underlying constitutional principle