226 N.J. Super. 94 (1988)
543 A.2d 965
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JACKIE WILLIAMS, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted February 24, 1988.
Decided June 22, 1988.
*96 Before Judges FURMAN, LONG and SCALERA.
Alfred A. Slocum, Public Defender, attorney for appellant (Philip V. Lago, Designated Attorney, of counsel and on the letter brief).
W. Cary Edwards, Attorney General, attorney for respondent (Nancy A. Hulett, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by LONG, J.A.D.
After a jury trial, defendant, Jackie Williams and her codefendant, John Wesley Williams, were convicted of felony murder (robbery) in violation of N.J.S.A. 2A:113-1, 2A:113-2 and 2A:85-14; robbery in violation of N.J.S.A. 2A:141-1 and 2A:85-14, and armed robbery in violation of N.J.S.A. 2A:141-1, 2A:151-5, 2A:85-14. Another codefendant, Samuel Seabrook, whose appeal we have also decided today, was convicted of felony murder. A third codefendant, Leonard Williams, was acquitted of the charges against him. (Jackie and John Williams are brother and sister; Leonard is their cousin.) Jackie Williams was sentenced to a custodial term of life in prison for felony murder and to two ten-year custodial terms on the other convictions to be served concurrently with the life sentence imposed. She appeals, claiming that the following errors warrant reversal:
POINT I:
THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN DENYING DEFENDANT'S MOTION FOR ACQUITTAL UNDER RULE 3:18-1.
POINT II:
THE DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL [NOT PRESENTED BELOW].
POINT III:
THE SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE AND CONSTITUTES AN ABUSE OF DISCRETION.
POINT IV:

*97 THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE.
POINT V:
THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO ADMIT THE RESULT OF A POLYGRAPH EXAMINATION.
We have carefully reviewed this record and have concluded that these contentions are entirely lacking in merit. R. 2:11-3(e)(2). However, Williams obliquely raised another claim in Point II of her brief which we believe warrants reversal: that certain actions of the prosecutor denied her Sixth Amendment right of confrontation.
The following is a summary of the facts in the case: On September 12, 1976, Frank Terrizzi, an attendant at the Arco gas station located at Pearl and Washington Streets in Bridgeton, New Jersey, was murdered. Approximately $56.00 in cash was taken from Terrizzi's pants pocket.
On the evening of the murder, Arthur Meade, a resident of Bridgeton, left his house at 8:00 p.m. to visit his sister, whose house on Pearl Street stood across the street from the Arco gas station. While walking to her house, Meade stopped at a local store to buy some cigarettes. There, Jackie Williams asked him for a match. When Meade left the store, he again saw Jackie Williams standing at the corner of Washington and Pearl Streets.
Meade proceeded onto Pearl Street before reaching his sister's house. There, he saw codefendants John Wesley Williams and Samuel Seabrook in an alleyway between two houses. He also noticed a bicycle wheel sticking out from the alleyway. Meade arrived at his sister's house between 8:40 and 9:00 p.m. Standing on the front steps of the house and looking out onto Pearl Street, Meade saw Seabrook walk across Pearl Street with a bicycle and enter the service area of the Arco station. According to Meade, by that time John Williams was no longer on the scene. While waiting for someone to answer his sister's door, Meade heard a gunshot. When no one answered the door, Meade left. Before getting home, he saw Seabrook race past *98 him on a bicycle after emerging from the opposite end of the same alleyway where Meade had seen him with John Wesley Williams (Laurel Street).[1]
Janie Brown Lewis, another resident of Bridgeton, lived on Washington Street, which is perpendicular to Pearl and Laurel Streets. On the evening of the murder, while Lewis was sitting on her front porch, she saw Jackie Williams, together with two men, walk past her house. One of the men with Jackie Williams pushed a bicycle. Approximately 10 minutes after Jackie Williams passed her house, Lewis heard police sirens. She followed the sirens and saw police cars at the Arco gas station. She could not see what had happened because a police officer directed people away from the station.
At approximately 9:05 p.m., about 15 minutes before the police arrived on the scene of the murder, William Sease pulled into the Arco station to buy some gas. He saw Terrizzi lying on the floor near a car in the service area. Sease apparently assumed Terrizzi was working on the car. Sease waited for service, but no one came to fill his tank. While he waited, Jackie Williams walked over to his car from across the street and asked him for a ride. She identified herself and told Sease she knew his children from school. Sease refused to give her a ride. In the meantime, a man who had been using a public telephone on Pearl Street walked into the station and discovered that Terrizzi had been shot. Jackie Williams followed him into the bay area of the garage. Terrizzi died shortly after being taken to a nearby hospital.
Sometime after the murder, Marcus King came forward and turned over to the police a .22 caliber revolver which he bought from Seabrook for $20. The bullet retrieved from Terrizzi's *99 body was not a .22 caliber revolver bullet, but could have been fired from the gun sold to King by Seabrook.
Around September 14, 1976, Leon Loatman, a classmate and friend of Terrizzi's who wanted to find out who had murdered Terrizzi, made up the story that his wife had a relative who had witnessed the murder. Loatman, an employee at a Bridgeton liquor store, circulated his story by telling it to approximately ten customers. After the story circulated, John Wesley Williams and another man came into the liquor store and asked Loatman for the eyewitnesses' name and address. Loatman said he did not have the information. The two men then left the store. About one to two weeks later, Leonard Williams came to the liquor store and inquired about Loatman's eyewitness. No one, other than John and Leonard Williams, came to inquire about Loatman's eyewitness story.
A previous trial concerning the murder of Frank Terrizzi had been held in July 1977.[2] On November 25, 1980, codefendant Samuel Seabrook confessed to Terrizzi's murder. Before confessing, Seabrook spoke with the officer who processed him and told him he was at the police station for robbery and "a guilty conscious." In a taped confession, Seabrook told the police he rode into the Arco gas station on a bicycle. He approached Terrizzi and demanded money. When Terrizzi moved in a threatening manner toward Seabrook, Seabrook shot him once with a .22 caliber revolver. After the shooting, Seabrook took some money from Terrizzi's pocket and fled. Seabrook also *100 told the police that he sold the .22 caliber revolver used in the murder to Marcus King. Seabrook indicated in his confession that John and Jackie Williams were nearby but were not involved in the crime. Jackie Williams testified in her own behalf and acknowledged her presence near the scene of the murder but denied any involvement.
The sum and substance of the State's case against Jackie Williams came from Meade and Sease who placed her near the scene of the crime around the time it occurred. Indeed, in opposition to Jackie Williams' motion for judgment of acquittal at the end of the State's case, this is all the prosecution argued:
With regard to Jackie Williams, we have two people placing her at the scene, Mr. Meade and Mr. Sease, right around the time of the incident, within minutes. In addition, we have  as Mr. Sewall indicated, why would anyone return to the scene? Maybe he hasn't watched enough murder mysteries, or whatever, on TV, but there's that old expression of returning to the scene of the crime. This is not a TV show, but it's also not unheard of that a criminal can return to the scene of the crime.[3]
The only other evidence against Jackie Williams was the following: when she took the stand in her own defense, the prosecutor questioned her concerning a confession she allegedly made to a third party, Julie Price:
Q. Do you know Julie Price?
A. No, I don't.
Q. Did you ever meet a Julie Price?
A. Yes, I did.
Q. Did you ever talk to Julie Price about the incident of September 12, 1976?
A. No, I did not.
Q. Didn't you tell Julie Price that you went in and asked for a match and then you even said that you were the one that shot the gas station attendant, didn't you?
A. Did I say that?
Q. Yes.
A. No, I did not.
*101 Jackie Williams' attorney moved for a mistrial "based upon the admissibility of hostile, inflammatory and totally improper evidence." A colloquy ensued between counsel and the court. The prosecutor conceded that he would not call Julie Price as a witness because she was out of state. A short recess was taken in order to permit Jackie Williams' counsel to consult case law on the issue after which he apparently withdrew his motion (or at least did not pursue it). The prosecutor then showed Jackie Williams the transcript of Julie Price's testimony (which he had previously recited) from Williams' prior trial to refresh her memory. Jackie Williams stated that it did not do so.
On appeal, Jackie Williams claims that the actions of her trial counsel in connection with this incident constituted ineffective assistance of counsel. More particularly, she claims that the failure of her counsel to request a limiting instruction as to the use of the Price testimony was "so egregious" as to deprive her of her constitutional right to representation by a reasonably competent attorney. We agree that the use of the prior testimony of Price is a basis for reversal but not for the reason urged by Williams.
The right of confrontation, U.S. Const. Amend. VI, confers upon an accused an entitlement to confront opposing witnesses. This includes the right to cross-examination. "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." Without proper confrontation, "the integrity of the factfinding process" is compromised. Berger v. California, 393 U.S. 314, 315, 89 S.Ct. 540, 541, 21 L.Ed.2d 508, 510 (1969) (quoting Linkletter v. Walker, 381 U.S. 618, 639, 85 S.Ct. 1731, 1743, 14 L.Ed.2d 601, 614 (1965)); State v. Williams, 182 N.J. Super. 427 (App.Div. 1982); State v. Vaccaro, 142 N.J. Super. 167 (App.Div.) certif. den. 71 N.J. 518 (1976)). This principle was explicitly declared in Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), where the Court stated:

*102 It cannot seriously be doubted at this late date that the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him. And probably no one, certainly no one experienced in the trial of lawsuits, would deny the value of cross-examination in exposing falsehood and bringing out the truth in the trial of a criminal case. See, e.g., 5 Wigmore, Evidence § 1367 (3d ed. 1940). The fact that this right appears in the Sixth Amendment of our Bill of Rights reflects the belief of the Framers of those liberties and safeguards that confrontation was a fundamental right essential to a fair trial in a criminal prosecution. Moreover, the decisions of this court and other courts (footnote omitted) throughout the years have constantly emphasized the necessity for cross-examination as a protection for defendants in criminal cases. This court in Kirby v. United States, 174 U.S. 47, 55, 56, 19 S.Ct. 574, 577, 43 L.Ed. 890, [893, 894 (1899)], referred to the right of confrontation as "[o]ne of the fundamental guarantees of life and liberty," and "a right long deemed so essential for the due protection of life and liberty that is guarded against legislative and judicial action by provisions in the constitution of the United States and in the constitutions of most, if not of all, the States composing the Union."
[380 U.S. at 404, 85 S.Ct. at 1068, 13 L.Ed.2d at 926.]
Because of the requirement of confrontation, any statement made other than by a witness while testifying, offered to prove the truth of the content of the statement is considered hearsay evidence and is inadmissible unless it falls within one of the exceptions to the hearsay rule. State v. Phelps, 96 N.J. 500, 508 (1984); State v. Williams, supra, 182 N.J. Super. at 431. In general, these exceptions were developed to address situations in which it would not be unfair to utilize the out of court statement of a witness against a party because there are strong indications of reliability.
Here, the prosecutor asked Jackie Williams whether she had confessed to Price that she shot the gas station attendant. When Jackie Williams denied this, he showed her Price's statement to that effect giving rise to the inescapable inference that Price said Jackie Williams had confessed. On its face, this procedure violated Williams' right of confrontation because it admitted into evidence a devastating, out-of-court statement by a witness which did not fall within one of the hearsay exceptions. See State v. Bankston, 63 N.J. 263, 271 (1973). The prosecutor knew that Julie Price was not present to verify the facts which he placed into evidence in positing the confession *103 question to Williams. He also did nothing to establish the "unavailability" of Price within the meaning of Evid.R. 62(6) so as to render her prior trial testimony admissible against Williams pursuant to Evid.R. 63(3). Thus, the trial judge erred in permitting the prosecutor to continue a line of questioning which placed before the jury innuendo evidence or inferences of evidence which the State could not get before the jury by direct testimony of the witness and which Jackie Williams had no opportunity to challenge meaningfully. See State v. Cullen, 103 N.J. Super. 360 (App.Div. 1968); Evid.R. 63(1) (Anno. 1988) at 522; 13 Wigmore, Evidence, § 781, § 1808.
For the same reason, the State's claim on appeal that the recitation of Williams' alleged confession to Price is admissible as a prior inconsistent statement must be rejected. Central to the use of a prior inconsistent statement for impeachment is the existence of admissible extrinsic evidence that such a statement was, in fact, made. No such evidence was present in this case. Williams denied the statement. The only way it could have come into the case was by testimony of Price or by the use of Price's trial testimony if she was "unavailable" within the meaning of Evid.R. 62(6). The prosecutor did not produce Price or seek leave to have her declared unavailable. Thus, reference to her statement was entirely improper.
Alternatively, the State argues that Price's prior testimony was properly used to refresh Williams' recollection of the conversation pursuant to Evid.R. 63(1)(b). The quid pro quo for the application of this rule is a claim that the memory of a witness is impaired. In such a circumstance, a witness may examine any document to refresh his or her memory. If looking at the document refreshes the witness's recollection, he or she may then testify as to that refreshed recollection. State v. Carter, 91 N.J. 86, 122-123 (1982). Here, the threshold requirement of impaired memory was lacking. Indeed, Williams expressed absolute certainty that she had never spoken to Price about the incident. Thus, the State was not free to *104 pursue the issue of the confession ostensibly to refresh her recollection.
In short, the evidence of Williams' alleged confession to Price should not have been allowed. It is true that Williams' counsel withdrew his motion for a mistrial based on the admission of the Price testimony. Thus, the standard to be applied on appeal is that of plain error, i.e. whether the error was "clearly capable of producing an unjust result." R. 2:10-2. We think it was. Indeed, on the backdrop of the meagre evidence which was adduced against Williams at trial, the admission of evidence that she "confessed" to the crime was obviously harmful. In fact, without the Price testimony, there was insufficient evidence to undergird a verdict of guilty against Jackie Williams. Thus, her conviction must be reversed.[4]
This brings us to the thorniest issue on appeal: whether Jackie Williams is subject to retrial. The Double Jeopardy clause, U.S. Const. Amend. V, is designed to prevent the government from engaging in repeated attempts to convict the accused, "thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." State v. Barnes, 84 N.J. 362, 370 (1980) quoting Green v. United States, 355 U.S. 184, 187-88, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957). The protection is based on the belief "that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense." State in the Interest of C.K., 198 N.J. Super. 290, 295 (App.Div. 1984), quoting United States v. Jorn, 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L.Ed.2d 543, 553 (1971). Society has an interest as well in the protection of the finality of judgments. United States v. *105 Scott, 437 U.S. 82, 92, 98 S.Ct. 2187, 2194, 57 L.Ed.2d 65 (1978). Strict interpretation has been given to the Double Jeopardy clause. For example, where a trial court's erroneous evidentiary ruling resulted in a resolution in the defendant's favor, the U.S. Supreme Court has held that a "judgment of acquittal, however erroneous, bars further prosecution of any aspect of the count and hence bars appellate review of the trial court's error." Sanabria v. United States, 437 U.S. 54, 69, 98 S.Ct. 2170, 2181, 57 L.Ed.2d 43, 57 (1978).
Generally, there are "no limitations whatever upon the power to retry a defendant who has succeeded in getting his first conviction set aside" (emphasis in original). North Carolina v. Pearce, 395 U.S. 711, 720, 89 S.Ct. 2072, 2078, 23 L.Ed.2d 656, 666 (1969). The only jeopardy limitation on such a retrial occurs where the conviction is reversed on the basis of insufficient evidence, i.e., where defendant was entitled to an acquittal at the time of trial because the prosecution failed to present enough evidence to undergird a conviction. Tibbs v. Florida, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982); Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).
In Burks, the trial judge denied defendant's motion for acquittal before the case was submitted to the jury. A guilty verdict was returned, and defendant appealed. The Circuit Court of Appeals reversed, holding that the government failed to present sufficient evidence of guilt beyond a reasonable doubt. The United States Supreme Court affirmed and held that when this occurs, retrial is barred on Double Jeopardy grounds. The court reasserted that the "Double Jeopardy Clause forbids a second trial for the purposes of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding. (footnote omitted). This is central to the objective of the prohibition against successive trials." Burks, supra, 437 U.S. at 12, 98 S.Ct. at 2147, 57 L.Ed.2d at 9. In so doing, Burks distinguished between reversal *106 due to trial error, which is no bar to retrial, and reversal resulting from evidentiary insufficiency. Thus,
reversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case. As such, it implies nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect, e.g., incorrect receipt or rejection of evidence, incorrect instructions, or prosecutorial misconduct. When this occurs, the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished. (citation omitted).
The same cannot be said when a defendant's conviction has been overturned due to a failure of proof at trial, in which case the prosecution cannot complain of prejudice, for it has been given one fair opportunity to offer whatever proof it could assemble. (footnote omitted). Moreover, such an appellate reversal means that the government's case was so lacking that it should not even have been submitted to the jury. Since we necessarily afford absolute finality to a jury's verdict of acquittal  no matter how erroneous its decision  it is difficult to conceive how society has any greater interest in retrying a defendant when, on review, it is decided as a matter of law that the jury could not properly have returned a verdict of guilty. (emphasis in original) (footnote omitted). [Burks, supra, 437 U.S. at 15-16, 98 S.Ct. at 2149-2150, 57 L.Ed.2d at 12-13.]
Greene v. Massey, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978) extended Burks to state proceedings. Our case presents the difficult problem that Greene specifically noted but did not address: what is to be done where a trial judge erroneously admits prosecution evidence, which, if properly held inadmissible, would have left the jury with insufficient evidence to convict? See Greene, supra, 437 U.S. at 27 and n. 9, 98 S.Ct. at 2155 and n. 9, 57 L.Ed.2d at 22 and n. 9.
Two lines of cases have spun off on this issue. The majority view is that incorrect receipt of evidence is trial error for jeopardy purposes and that the court need not examine the sufficiency of the remaining, properly admitted evidence. The opinion in United States v. Harmon, 632 F.2d 812 (9th Cir.1980) expressed the reasoning this way:
Reversal for failure to suppress evidence involves only a determination that the trial process was defective in a material respect, and implies nothing as to the sufficiency of the evidence of guilt of the defendant. The untainted *107 evidence introduced by the government does not necessarily reflect all other available evidence of the defendant's involvement. It is impossible to know what additional evidence the government might have produced had the faulty evidence been excluded at trial, or what theory the government might have produced had the evidence before the jury been different. United States v. Mandel, 591 F.2d 1347, 1373-74 (4th Cir.), rev'd on other grounds, 602 F.2d 653 (4th Cir.1979) (en banc); United States v. Block, 590 F.2d 535, 544 n. 12 (4th Cir. 1978). It would prolong trials unduly to adopt a rule that would require the government to introduce all available evidence and assert every possible legal theory in anticipation of reversal of trial court rulings admitting evidence. Moreover,
it is at least doubtful that appellate courts would be as zealous as they now are in protecting against the effects of improprieties at the trial or pretrial stage if they knew that reversal of a conviction would put the accused irrevocably beyond the reach of further prosecution. In reality, therefore, the practice of retrial serves defendants' rights as well as society's interest. United States v. Tateo, 377 U.S. 463, 466, 84 S.Ct. 1587, 1589, 12 L.Ed.2d 448 (1964). See also, United States v. Houltin, 566 F.2d 1027, 1033 (5th Cir.1978).
[632 F.2d at 814].
See also United States v. Porter, 807 F.2d 21, 24 n. 2 (1st Cir.1986) cert. den. ___ U.S. ___, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987); United States v. Tranowski, 702 F.2d 668, 671 (7th Cir.1983) cert. den. 468 U.S. 1217, 104 S.Ct. 3586, 82 L.Ed.2d 884 (1984). Linam v. Griffin, 685 F.2d 369, 373-74 (10th Cir.1982), cert. den. 459 U.S. 1211, 103 S.Ct. 1207, 75 L.Ed.2d 447 (1983); United States v. Sarmiento-Perez, 667 F.2d 1239 (5th Cir.), cert. den. 459 U.S. 834, 103 S.Ct. 77, 74 L.Ed.2d 75 (1982); Tapp v. Lucas, 658 F.2d 383 (1981), cert. den. 456 U.S. 972, 102 S.Ct. 2233, 72 L.Ed.2d 845 (1982); People v. Sisneros, 44 Colo. App. 65, 606 P.2d 1317, 1319 (1980); State v. Gray, 200 Conn. 523, 512 A.2d 217 (1986), cert. den. 479 U.S. 940, 107 S.Ct. 423, 93 L.Ed.2d 373 (1986); Hall v. State, 244 Ga. 86, 93-94, 259 S.E.2d 41 (1979); Irons v. State, 272 Ind. 287, 397 N.E.2d 603, 605-606 (1979); Mulry v. State, 399 N.E.2d 413, 419 (Ind. App. 1980); Phillips v. Commonwealth, 600 S.W.2d 485, 486-487 (Ky.App. 1980); Commonwealth v. Taylor, 383 Mass. 272, 284, 418 N.E.2d 1226, 1233 n. 16 (1981); State v. Boone, 284 Md. 1, 393 A.2d 1361, 1368-70 (1978); State v. *108 Wood, 596 S.W.2d 394, 397-399 (Mo. 1980) (en banc); Ex parte Duran, 581 S.W.2d 683, 684-686 (Tex. Crim. App. 1979); State v. Lamorie, 610 P.2d 342, 347 (Utah 1980); State v. Van Isler, 168 W. Va. 185, 190, 283 S.E.2d 836, 839 n. 3 (W. Va. 1981).[5]
In the second line of cases, courts have approached the issue from an entirely different perspective, excising the inadmissible evidence from the record and then evaluating the redacted record for evidential sufficiency. Thomas v. United States, 530 A.2d 217 (D.C.App. 1987); State v. Bannister, 60 Haw. 658, 594 P.2d 133 (1979); But see State v. Allen, 744 P.2d 789 (Haw.Ct.App. 1987); State v. Alexander, 281 N.W.2d 349 (Minn. 1979); State v. Abel, 600 P.2d 994 (Utah 1979). Where the excised record does not contain sufficient evidence to undergird a conviction, a judgment of acquittal is ordered on the theory that the prosecution failed to produce sufficient legally competent evidence of guilt thus precluding a retrial on jeopardy grounds.
We are here faced with the choice of acquitting a defendant who has been convicted on sufficient evidence, some portion of which is later ruled inadmissible or ruling that the admission of that evidence was "trial error" thus paving the way for retrial. Today we adopt the majority rule in the circuits as articulated in United States v. Harmon, supra. In so doing, we reject the approach embodied in Thomas v. United States, supra, because we view it as artificially creating a jeopardy insufficiency by redacting a trial record after the fact. If the whole record presented to a jury is sufficient to sustain a *109 conviction, a later appellate ruling rendering some of the evidence inadmissible should not create a jeopardy issue.
We adopt the reasoning expressed by the Court of Appeals for the Seventh Circuit in United States v. Tranowski, supra, in rejecting Thomas:
A contrary conclusion would lead the government to "overtry" its cases  to introduce redundant evidence of the defendant's guilt  in order to insure itself against the risk of not being able to retry the defendant should some of its evidence be held on appeal to be inadmissible. It would also require the court of appeals, in every case where it reversed a conviction because of erroneous admission of evidence, to determine the sufficiency of the remaining evidence  something the court would otherwise be required to do only if the government argued harmless error. [702 F.2d at 671.]
We also agree with Tranowski that the possibility of government harassment of defendants by piecemeal trials is unlikely:
If the government holds back some of its evidence the first time, it runs the very considerable risk that the trial court will exclude other evidence and that the remaining evidence will be insufficient, with the result that either the jury will acquit or the judge will dismiss the charges against the defendant for insufficiency of the evidence; either way retrial will be barred. The possibility of such harassment is too remote to justify a rule that would bar the government from retrying a defendant who had won a reversal of his conviction because of erroneous admission of evidence, merely because the remaining evidence was insufficient by itself to support conviction. [Id.]
Here, the approach we have adopted is particularly suitable because we know that the untainted evidence introduced by the State in this case does not reflect all of its available evidence. Indeed, Price herself may be presented to testify as to Jackie Williams' confession or be declared "unavailable," thus rendering that evidence admissible. Moreover, as the court said in Harmon, it is impossible to know what additional evidence the State might have produced had the faulty evidence been properly excluded.
We think that this approach fully accounts for the interests sought to be protected by the Double Jeopardy clause, the defendant's interest in an error free adjudication, and society's interest in seeing that the guilty are convicted after a fair trial.
Reversed and remanded.
NOTES
[1] Meade's credibility was fully explored by defendants at trial due to the fact that he had admitted to being under the influence of marijuana the night of the crime and had presented various versions of what he had seen at various proceedings. This one, his direct trial testimony, is the most favorable to the State's case.
[2] Jackie, John and Leonard Williams were each individually indicted in 1976. The Cumberland County indictment charged them with robbery, contrary to N.J.S.A. 2A:141-1, armed robbery, contrary to N.J.S.A. 2A:151-5, and first degree murder, contrary to N.J.S.A. 2A:113-1 and 2A:151-5. After a trial in July 1977, the jury found all three defendants guilty of all charges. On April 31, 1980, we affirmed the convictions, but did so without prejudice to the defendants' right to make a motion for a new trial based upon newly discovered evidence. The trial judge heard testimony on the motions in January 1982, which were based, in part, on a confession made by Samuel Seabrook to the police in November 1980. Judge Porreca denied the motions. We reversed and remanded for this trial.
[3] Although the prosecutor also indicated that he would be arguing before the jury that Jackie Williams attempted to flee the scene, not only did he fail to make that claim before the jury, but there was no suggestion of flight during the case. It has thus been interjected in this appeal improperly.
[4] We reject Williams' claim as to the ineffectiveness of the counsel she received based upon his failure to seek a curative instruction because we do not think a curative instruction would have been effective to repair the damage done by the prosecutor's misuse of Price's testimony.
[5] A puzzling variation on this theme is presented by several cases which hold that while the admission of inadmissible evidence is mere trial error for jeopardy purposes, the reviewing court must nevertheless consider the sufficiency of all of the evidence that was submitted to the jury, including that later found to be inadmissible. See e.g. United States v. Gonzalez-Sanchez, 825 F.2d 572, 588-589 (1st Cir.1987), cert. den. ___ U.S. ___, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987); U.S. v. Marshall, 762 F.2d 419, 423 (5th Cir.1985).