626 A.2d 63

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. KENNETH N. MABEN, DEFENDANT–
RESPONDENT.

Argued March 30, 1993—Decided June 23, 1993.

*Lisa Sarnoff Gochman,* Deputy Attorney General, argued the cause for appellant (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Ms. Gochman* and *James E. Jones, Jr.,* Deputy Attorney General, of counsel and on the brief).

*Robert L. Sloan,* Assistant Deputy Public Defender, argued the cause for respondent (*Zulima V. Farber,* Public Defender, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

At issue in this sexual-assault case is whether the out-of-court statements of an alleged child victim who did not testify at trial were properly admitted under *Evidence Rule* 63(33). Central to that inquiry is whether pursuant to *Evidence Rule* 62(6) the State has demonstrated that it has been "unable, despite due diligence, to procure the attendance of the witness."

The trial court, holding that the State had established the child witness's unavailability, allowed the hearsay testimony. A jury convicted defendant. The Appellate Division reversed, finding that the State had failed to make a good-faith effort to obtain the child's presence at trial. 259 *N.J.Super.* 93, 611 *A.*2d 659 (1992). We granted the State's petition for certification, —— *N.J.* ——, —— *A.*2d —— (1992), addressed solely to the issue of unavailability.

### I

Defendant was convicted of sexually abusing J.G., a six-year old. The State did not call J.G. as a witness at the trial because her mother had taken her out of the state. Instead, the State introduced her statements into evidence through the hearsay testimony of G.H., her eleven-year-old neighbor, and Ms. Rudd, a social worker. A state trooper also testified at the trial.

G.H., age thirteen at the time of the trial, testified that approximately two years before her court appearance, J.G. had told her that Kenny, her babysitter, had forced her to "suck his private and play with it" while they were in the family trailer. G.H. asked J.G. where her mother was at the time and "did she [J.G.] want to or did he make her?" J.G. responded that her mother was not home and that she "didn't want to." That

same day, G.H. told her father, who immediately called the state police. State Trooper Maruca spoke to G.H.'s father and then went to J.G.'s home and spoke with J.G. and her mother. J.G. appeared shy and quiet at first. Trooper Maruca asked J.G. whether defendant had "put his private parts in her mouth." J.G. did not answer orally, but shook her head up and down twice, indicating "yes." The trooper then asked her how many times this had occurred, and she held up two fingers.

The next day, January 5, 1988, J.G.'s mother called Ms. Rudd, a social worker with the Division of Youth and Family Services (DYFS), who had worked with the family for over a year. Ms. Rudd testified that she had gone to the house that same day and had questioned J.G. while they were alone in the bedroom. J.G. identified "Kenny" as the babysitter. When Ms. Rudd asked J.G. if she had anything to tell her about Kenny, the child would not talk. Eventually, the child indicated the male sex organ and related that Kenny had made her perform fellatio two times. She then motioned to her vagina and said that he touched her there twice, and that he had twice tried to put his penis into her vagina but "it would not fit."

After speaking with Ms. Rudd and conducting his own investigation, Trooper Maruca learned defendant's full name and address, and instructed defendant to communicate him. On January 11, 1988, defendant called Trooper Maruca, who, together with Trooper Ciacco, interviewed him regarding J.G.'s charges. Defendant waived his *Miranda* rights and confessed to the incident that had occurred sometime in October. He stated that he had drunk two bottles of alcohol after work, and that J.G., at his request, performed two acts of fellatio on him while he babysat her. He also stated that he put his hands into her pants and on her vagina. Because defendant could not read, Trooper Maruca reviewed the typed statement with him before defendant signed it. Trooper Maruca read defendant's signed confession to the jury. The validity of the confession is not at issue.

■ Defendant's confession standing alone cannot support his conviction. As the Appellate Division so aptly stated, "Without the hearsay statements of the trial, the proofs could not withstand a verdict of judgment of acquittal under *R.* 3:18–1." 259 *N.J.Super.* at 95, 611 *A.*2d 659.

The trial court found that the State had made adequate efforts to locate J.G. and that therefore she was "unavailable" under *Evidence Rule* 63(33). The trial court then admitted into evidence J.G.'s out-of-court statements made to G.H. and Ms. Rudd.

Defendant did not testify or call any witnesses. The jury convicted defendant of first-degree aggravated sexual assault in violation of *N.J.S.A.* 2C:14–2a(1); second-degree sexual assault in violation of *N.J.S.A.* 2C:14–2b; and third-degree endangering the welfare of a child in violation of *N.J.S.A.* 2C:24–4a. The court denied defendant's motion for a new trial and sentenced defendant to a twelve-year custodial term on the first count, and concurrent six- and four-year terms on the other two counts. Defendant was released on parole in January 1993.

The Appellate Division reversed defendant's convictions and remanded the matter for a new trial. The panel called the proof of due diligence in this case "woefully deficient," and cautioned:

> If our courts allow the skimpy proofs in this case to pass muster as a diligent search for a missing witness, we see no reason why any prosecutor would venture beyond the boundaries of this limited inquiry. It is obviously advantageous to have the "unavailable" child's declarations provided unvarnished to a jury, free of the potential perils of cross-examination.

[259 *N.J.Super.* at 97, 611 *A.*2d 659.]

We agree that the State failed to prove that it had exercised due diligence in its attempt to locate J.G., and therefore affirm.

## II

In pre-trial motions defendant challenged the admissibility of J.G.'s statements to G.H. and Ms. Rudd on various grounds. The only issue before us, however, is J.G.'s unavailability.

At the *Evidence Rule* 8 hearing held in February 1990, the prosecutor described the State's attempts to locate J.G. Those efforts commenced after a trial call date of January 20, 1990, two years after defendant's arrest, and approximately three weeks before the *Rule* 8 hearing. The assistant prosecutor explained:

> Judge, what we did in this case is we had the original address of the victim which is in Cookstown or Wrightstown. I think it's some Mary Street—some number on Mary Street. What we did is we sent a letter to that last address that we had. Okay. However, that—she no longer lived there. Then we got some indication that she may live at [a trailer park in] Wrightstown. We sent a letter to that address, and it was checked off "Attempted—Not known." Okay. And that the person was not there.

> Then my investigator contacted the Welfare Board as we had some indication that the victim's mother was receiving assistance. Our sources at the Welfare Board gave an address in Houston. This was not an address that was provided to us from the victim as a forwarding address. This is what we found out through our investigation, Judge. And this was an address of 1520 Silver Street from Houston, Texas.

> We sent a teletype to that—to the Houston Police Department asking them to attempt to locate—and it says, "Police attempts to locate [S.G.] at 1520 Silver Street, Houston, Texas, and request her to call Investigator Bell with reference to her testifying at trial. Thank you in advance for your assistance in this matter."

> We then receive a teletype back from the Houston Police Department to our Prosecutor's Office in reference to locating missing witness [S.G.] at 1520 Silver Street, and their reply was, "Please be advised that we have a street name Silber, S-i-l-b-e-r, and both street addresses were checked—that being Silver, S-i-l-v-e-r, and Silber, S-i-l-b-e-r, Street 1520 with no luck. Both locations were business/warehouses and not residences." That's the indication that we had, Judge.

> Being that we had no other way to—I mean, right there the trail ended. Once there was no—the address that the victim's mother had given the Welfare Board as a forwarding address was not a good address. We did not know how else to proceed in this matter. In other words, the trail just ended there, Judge.

After defense counsel argued that the State should have pursued further investigative leads, such as a forwarding address from the post office, J.G.'s New Jersey school records, or should have contacted the welfare department in Houston, Texas, the State responded:

> [Defense counsel] is saying should, should, should. If they had, if they had, if they had. State didn't just do one thing in this matter, Your Honor, we sent

notices to two addresses in New Jersey. Both of those did not turn up anything.

We then went and contacted the Welfare Board. That's now our third step in that we got an address in Texas, which leads us to our fourth step which is contacting the Houston Police Department.

The trial court found the case "close," stating:

So we have no evidence that the mother and the child ever got to Texas. We have no evidence that the mother and daughter ever applied for welfare in Texas. We have no indication that the child was ever in school in Texas. The information could be that—the information given by the Burlington County Welfare Department as this being a residence in Texas, this address, was just totally inaccurate.

Now, I think in the future maybe as Prosecutors get—become aware that, hey, if you're going to start relying on this rule, you better make sure that you've done everything possible in trying to run down the victim in Texas or Wisconsin or wherever it is, but I think maybe the Prosecutor—I *think I'm persuaded the Prosecutor squeaked by by having the Texas police authorities go out and try to find such an address, but they were unable to; and so, I'm going to find that the witness was unavailable,* ·... (emphasis added).

Two days later, the defense renewed its motion to exclude J.G.'s statements, arguing that the State had known that J.G. and her mother would be leaving New Jersey in early March 1988, and had mentioned going to Florida, where they had previously lived. Even though DYFS became aware of the family's departure and notified the Prosecutor's Office before the matter had even been presented to the grand jury, the State made no effort to locate the family until January 1990, after the trial date had been scheduled. On that basis, defense counsel urged "that the State can't show unavailability because you can't wait two years after the trail gets cold, so to speak perhaps, and then say, we can't find her." Further, as the defense pointed out, DYFS records suggested that J.G.'s mother had been in Florida at a specified address and had considered moving there. The State, however, never checked potential addresses in Florida. The State maintained that it had no obligation to check all fifty states to locate a witness.

Moreover, even though the trial did not commence until one month after the pre-trial hearing, there was no evidence that the State had resumed searching for J.G. Unpersuaded by

defendant's arguments, the trial court reaffirmed its earlier ruling, noting that

> [t]he Prosecutor did what any Prosecutor [sic] had done. They carry the file through the stages—the ordinary stages of the plea, the pretrial conference and it's not really until shortly before trial or when trial is scheduled that the Prosecutor makes a serious effort to contact witnesses.

## III

The Legislature adopted *Evidence Rule* 63(33)'s "tender years" exception to the hearsay rule after our decision in *State v. D.R.*, 109 *N.J.* 348, 537 A.2d 667 (1988), in which we proposed a more liberal rule of admissibility for statements made by young sex-abuse victims. *Evidence Rule* 63(33) (statements by a child relating to a sexual offense) provides:

> A statement by a child under the age of 12 relating to a sexual offense under the Code of Criminal Justice committed on, with, or against that child is admissible in a criminal proceeding brought against a defendant for the commission of such offense if (a) the proponent of the statement makes known to the adverse party his intention to offer the statement and the particulars of the statement at such time as to provide him with a fair opportunity to prepare to meet it; (b) the court finds, in a hearing conducted pursuant to Rule 8(1), that on the basis of the time, content, and circumstances of the statement there is a probability that the statement is trustworthy; and (c) either (i) the child testifies at the proceeding, or *(ii) the child is unavailable as a witness and there is offered admissible evidence corroborating the act of sexual abuse;* provided that no child whose statement is to be offered in evidence pursuant to this rule shall be disqualified to be a witness in such proceeding by virtue of the requirements of paragraph (b) of Rule 17. (emphasis added).

We proposed the "tender years" exception because we recognized that a child victim's account in sexual-abuse cases "may be the best and sometimes the only evidence that a sexual assault has taken place." 109 *N.J.* at 359, 537 A.2d 667. The "tender years" exception therefore "enable[s] the judicial system to deal more sensibly and effectively with the difficult problems of proof inherent in child sex abuse prosecutions." *Ibid.* (footnote omitted). Nonetheless, the Court recognized that "any such modification of the hearsay rule must adequately recognize and protect the substantial constitutional interests

of defendants in such proceedings." *Id.* at 363, 537 *A.2d* 667 (footnote omitted).

In addressing the standards for admissibility of such statements, we emphasized "the constitutional concerns" of the defendant:

> The admission into evidence of reliable out-of-court statements by a child victim in a sexual abuse prosecution obviously serves legitimate and important law enforcement interests. However, such a rule threatens the equally significant interests of the defendant, who seeks to exercise the basic rights of confrontation and cross-examination so essential to the jury's duty to assess the credibility of witnesses.
>
> [*Id.* at 369, 537 *A.2d* 667.]

We recognized that a procedure favoring confrontation "will afford the jury an opportunity to evaluate the testimony relating the child's out-of-court statements in the context of the child's communicative skills, demeanor, and credibility as a witness at trial." *Id.* at 370, 537 *A.2d* 667. As we explained,

> if a child's out-of-court statement concerning an act of sexual abuse is to be admissible, that child should testify at trial in order to afford the jury an opportunity to assess the child's credibility and to afford the defendant the right of confrontation and cross-examination.
>
> [*Id.* at 371, 537 *A.2d* 667.]

Recently, while discussing evidentiary issues in child-sexual-abuse cases, this Court reiterated its concern that

> [s]ociety must tread a measured path that avoids ignoring the reality of child sexual abuse and avoids as well the possibility of unjust conviction of this most shameful of crimes. In *Maryland v. Craig,* 497 *U.S.* 836, 110 *S.Ct.* 3157, 111 *L.Ed.2d* 666 (1990), four members of the Supreme Court cautioned that courts should be particularly insistent in protecting innocent defendants in child-sexual-abuse cases because of the reliability problems created by children's suggestibility in child-sexual-abuse prosecutions. *Id.,* 497 *U.S.* at 868, 110 *S.Ct.* at 3175–76, 111 *L.Ed.2d* at 693–94 (Scalia, Brennan, Marshall & Stevens, JJ., dissenting).
>
> [*State v. J.Q.,* 130 *N.J.* 554, 562, 617 *A.2d* 1196 (1993).]

Likewise, in its Joint Resolution adopting *Evidence Rule* 63(33) the Legislature and the Governor recognized the importance of protecting a defendant's rights.

> These statements may be introduced if either the child testifies at the proceedings or, if the child is not available, if there is admissible evidence introduced which corroborates the act of sexual abuse. There must also be sufficient

notice to the defendant of the particulars of the statement and the intent to introduce it so that he may have a fair opportunity to meet it since a defendant has the constitutional right to confront the witnesses against him. Additionally, the court must conduct a preliminary inquiry as to whether there is a probability that the statement is trustworthy given the time, content, and circumstances of the statement.

[*Assembly Judiciary Committee, Statement to Senate Joint Resolution No. 56* 3 (March 20, 1989).]

Accordingly, the "tender years" exception carefully balances the need to liberalize the hearsay rules for child sexual-abuse victims with the criminal defendants' constitutional rights under the Confrontation Clause. *U.S. Const.* amend. VI; *N.J. Const.* art. I, ¶ 10. The Sixth Amendment's Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." New Jersey's constitution provides substantially the same right (substituting the word "have" for "enjoy"). The United States Supreme Court explained the importance of the clause:

There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal. [*Pointer v. Texas,* 380 *U.S.* 400, 405, 85 *S.Ct.* 1065, 1068, 13 *L.Ed.*2d 923, 927 (1965).]

Keeping in mind the delicate balance between the State's need to prosecute and convict child molesters with a defendant's constitutional right of confrontation, we conclude that before the State can introduce hearsay testimony in a case such as this, the State must prove that the child is truly unavailable. Although [t]he law does not require the doing of a futile act," *Ohio v. Roberts,* 448 *U.S.* 56, 75, 110 *S.Ct.* 2531, 2543, 65 *L.Ed.*2d 597, 613 (1980), the possibility of failure or of a formidable search does not justify a failure to go beyond cursory threshold inquiries.

### IV

Defendant does not argue that J.G.'s statements were not trustworthy but only that the State has failed to prove that the

child was unavailable to testify. *Evidence Rule* 62(6), the definitional section for *Evidence Rules* 63–66, states:

"[u]navailable as a witness" means that (a) the witness is dead, or (b) the witness is beyond the jurisdiction of the court's process to compel appearance, or (c) the witness is unable to testify because of then existing physical or mental disability, or *(d) the proponent of the statement is unable, despite due diligence, to procure the attendance of the witness.* A witness is not unavailable when the condition was brought about by the procurement, wrong-doing or culpable neglect of the party offering his statement, or when his deposition can be taken by the exercise of reasonable diligence and without undue hardship, and the probable importance of the testimony is such as to justify the expense of taking such deposition. (emphasis added).

In *Barber v. Page*, the Supreme Court established that "a witness is not 'unavailable' for purposes of * * * the exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." 390 *U.S.* 719, 724–25, 88 *S.Ct.* 1318, 1322, 20 *L.Ed.*2d 255, 260 (1968). The Court held that the use of a witness's preliminary-hearing testimony against the defendant at his trial deprived him of his right of confrontation because the State had made no effort to obtain the prisoner-witness's presence at trial.

In another case concerning preliminary-hearing testimony, however, the Court found that the State had not violated the defendant's rights, because the witness was constitutionally unavailable. The Court noted that the witness had failed to appear after five subpoenas had been issued to her parents' address and that the parents had no way to communicate with the witness, even in an emergency. Justice Blackmun, writing for the Court, stated:

[i]f no possibility of procuring the witness exists (as, for example, the witness' intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation. "The lengths to which the prosecution must go to produce a witness * * * is a question of reasonableness." California v. Green, 399 US, [149] at 189, n 22, 26 LEd2d 489, 90 SCt 1930 (concurring opinion, citing Barber v. Page, supra). The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness. As with

other evidentiary proponents, the prosecution bears the burden of establishing this predicate.

[*Ohio v. Roberts, supra,* 448 *U.S.* at 74–75, 100 *S.Ct.* at 2543, 65 *L.Ed.*2d at 613.]

Justice Brennan, joined by Justices Marshall and Stevens, dissented, finding that the prosecution had not done enough:

Although the rigor of the undertaking might serve to palliate a failure to prevail, it cannot justify a failure even to try. Just as Barber cautioned that "the possibility of a refusal is not the equivalent of asking and receiving a rebuff," 390 US, at 724, 20 LEd2d 255, 88 SCt 1318, (quoting the decision below, 381 F2d 479, 481 (CA 10 1966) (Aldrich, J., dissenting)), so, too, the possibility of a defeat is not the equivalent of pursuing all obvious leads and returning emptyhanded. The duty of "good-faith effort" would be meaningless indeed "if that effort were required only in circumstances where success was guaranteed."

[448 *U.S.* at 80, 100 *S.Ct.* at 2546, 65 *L.Ed.*2d at 617, (quoting *Mancusi v. Stubbs,* 408 *U.S.* 204, 223, 92 *S.Ct.* 2308, 33 *L.Ed.*2d 293 (1972) (Marshall, J., dissenting)).].

Courts have found that states have failed to prove unavailability when they have not made a good-faith effort. Good faith is determined based on the circumstances of each case. 5 *Wigmore, Evidence* ¶ 1404, n. 13; *see, e.g., United States v. Quinn,* 901 *F.*2d 522 (6th Cir.1990) (finding effort insufficient when officer attempting to subpoena crucial witness given only five working days and no one checked with possible employers); *United States v. Rothbart,* 653 *F.*2d 462 (10th Cir.1981) (noting government cleared existing obstacles to witness's trip outside jurisdiction by deposing him and releasing him from subpoena); *United States v. Mann,* 590 *F.*2d 361 (1st Cir.1978) (finding government did not make as vigorous attempt to secure presence of witness as it would have if it did not have prior recorded testimony because it took deposition and returned witness's passport and plane ticket); *United States v. Lynch,* 499 *F.*2d 1011 (D.C.Cir.1974) (finding inadequate effort even though witness subpoenaed and prosecutor told witness to appear in court on the next day, because prosecutor failed to send investigator, who searched for one day, to inquire at hospitals, police department, morgue, or employer when witness did not appear).

In *State v. Roman*, 248 *N.J.Super.* 144, 590 *A.2d* 686 (App. Div.1991), the court considered the meaning of "unavailability" under *Evidence Rule* 63(33). The court held that the State had not used due diligence because it had not attempted to use the Uniform Act to Secure the Attendance of Witnesses, *N.J.S.A.* 2A:81–18, to insure the child witness's attendance after her mother had ignored a subpoena.

In so ruling the court stated:

We are sensitive to the rights of victims and wish to spare them any further suffering. However, other considerations are paramount. The law is entitled to every person's evidence. A witness cannot be made the final arbiter as to whether he or she will testify. So too, the rights of the accused must be considered. Although the demands of the hearsay rules and the Sixth Amendment's confrontation clause are not equivalent or congruent, the United States Supreme Court has said that both rest on "similar values." *Idaho v. Wright*, [497] *U.S.* [805, [814] [,] 110 *S.Ct.* 3139, 3146, 111 *L.Ed.*2d 638, 651 (1990). We need not determine the exact requirements imposed by the confrontation clause, because the precise issue is not before us. We note, however, that we are dealing here with an evidentiary rule not falling within the hearsay exceptions that have been historically and traditionally recognized. *Id.* at [816], 110 *S.Ct.* at 3147, 111 *L.Ed.*2d at 653. The fact that we are treading on new ground impels caution. Finally, we are concerned with the right of the public to insist that the best available evidence be used in the prosecution of crimes. *See State v. Williams*, 226 *N.J.Super.* 94, 102, 543 *A.2d* 965 (App.Div.1988).

[*Id.*, 248 *N.J.Super.* at 150, 590 *A.2d* 686.]

In *State v. Hamilton*, 217 *N.J.Super.* 51, 524 *A.2d* 1281 (App.Div.), *certif. denied*, 108 *N.J.* 581, 531 *A.2d* 1355 (1987), the court found the State's efforts constitutionally insufficient because the State had failed to communicate with school authorities or police in Virginia after that state's welfare authorities had refused to provide assistance.

We are unpersuaded that the State acted with due diligence to procure Bunn's attendance. It appears to us that it did little more than make a number of telephone inquiries in New Jersey and of people in Virginia as to Bunn's whereabouts and thereafter acquiesced in their refusal to cooperate.

The State's investigation should not have been so easily thwarted. No effort was made to enlist the aid of local police or prosecuting authorities in the area of Richmond, Virginia to locate the witness or to secure the needed information from the witness' mother by any form of testimonial compulsion. Nor was any

attempt made to locate Bunn through the Richmond public school authorities. Indeed, the State's investigator never even visited Virginia.

[*Id.,* 217 *N.J.Super.* at 55, 524 *A.*2d 1281.]

In view of the significance of the right infringed by that procedure, the court reversed the conviction. *Id.* at 56, 524 *A.*2d 1281.

The New Jersey cases, following the principles established by the United States Supreme Court in *Barber, supra,* 390 *U.S.* 719, 88 *S.Ct.* 1318, 20 *L.Ed.*2d 255 and *Roberts, supra,* 448 *U.S.* 56, 100 *S.Ct.* 2531, 65 *L.Ed.*2d 597, have required the State to prove unavailability and a good-faith effort to procure the witness before allowing the introduction of hearsay testimony. The State, for the first time before this Court, however, asserts that the "unavailability" rule should not be applied to out-of-court statements sought to be introduced under *Evidence Rule* 63(33). The State, relying on a recent Supreme Court case, *White v. Illinois,* 502 *U.S.* ——, 112 *S.Ct.* 736, 116 *L.Ed.*2d 848 (1992), contends that the requirement of availability is limited only to circumstances in which preliminary-hearing testimony is at issue. In *White,* the Supreme Court determined that courts do not have to conduct an "unavailability" assessment when the State proffers a statement that falls under a firmly-rooted hearsay exception such as spontaneous declarations or statements made in the course of medical treatment, because those statements have a proven indicia of reliability. *Id.* 502 *U.S.* at ——, 112 *S.Ct.* at 739, 116 *L.Ed.*2d at 855.

In *Idaho v. Wright,* 497 *U.S.* 805, 110 *S.Ct.* 3139, 111 *L.Ed.*2d 638 (1990), the Court found, however, that the admission of a pediatrician's testimony regarding a two-and-a-half year old's statements about sexual abuse violated the Confrontation Clause because the state's residual hearsay exception was not a firmly-rooted hearsay exception. The testimony did not have sufficient "indicia of reliability" to permit its admission into evidence.

Neither of the recent Supreme Court child sex-abuse cases provides guidance for the Maben situation because both cases involved the reliability of the hearsay testimony—which Maben does not contest—rather than the unavailability of the child-witness. In *Wright,* the Court specifically noted that unavailability was not at issue because both sides had agreed that the child was too young to testify. 497 *U.S.* at 816, 110 *S.Ct.* at 3147, 111 *L.Ed.*2d at 652. Similarly, in *White, supra,* the trial court was never asked to make a finding of unavailability, and because of emotional trauma, the child never testified. 502 *U.S.* at ——, 112 *S.Ct.* at 739, 116 *L.Ed.* at 855.

In proposing *Evidence Rule* 63(33) we did not differentiate between those cases in which the witness has previously testified and those, like the one before us, in which the witness has never been subject to cross-examination. Rather, we focused on protecting the defendant's constitutional rights when the State seeks to introduce potentially-damaging, uncontested hearsay testimony. *D.R., supra,* 109 *N.J.* 348, 537 *A.*2d 667. The requirements of due diligence, a good-faith effort, and reasonableness were made an integral part of the requirements that govern the admission of evidence pursuant to *Evidence Rule* 63(33).

Before a court admits hearsay testimony under the "tender years" exception, it must conduct a probing inquiry of the State's efforts to locate the missing witness to ensure that the search was duly diligent. Courts must scrutinize, among other factors, the State's good-faith effort in light of the seriousness of the crime, the necessity of the witness-declarant, the probability of finding the witness based on the knowledge and resources available, the means at the State's disposal, and the manner in which the State chose to undertake its search, including the timing. A court may consider other significant factors relevant to the case. At a minimum, however, courts must conduct a balancing test, examining the burden to the defendant if he or she is unable to confront the missing

witness, the existence or absence of corroborating evidence, the burden of the search on the State, and the gravity of the crime committed.

We recognize that we may be imposing an additional burden on the State. However, when a defendant's constitutional rights are at stake, the State must prove that the witness-declarant is truly unavailable for cross-examination before introducing hearsay statements.

## V

■ Applying the foregoing standards we find that the prosecutor failed to conduct a duly-diligent search for J.G. First, there was a need to protect defendant's rights. Unlike other cases, in which the missing witness had testified under oath and had been subject to cross-examination, J.G. never answered questions from defense counsel. She never provided defendant's last name and was never asked to identify defendant in a line-up or through photographs. In addition, G.H., the eleven-year old next-door neighbor, could not clearly articulate when J.G. had told her about the alleged sexual abuse.

Furthermore, although defendant confessed "in lurid detail," *supra,* at 505, 626 *A.*2d at 73, a defendant cannot be convicted solely on the basis of a confession without independent proof of the trustworthiness of the confession and independent proof of the injury. *State v. Di Frisco,* 118 *N.J.* 253, 271, 571 *A.*2d 914 (1990); *State v. Lucas,* 30 *N.J.* 37, 56, 152 *A.*2d 50 (1959). The State failed to introduce corroborating evidence of the defendant's confession, other than the hearsay testimony, that the sexual abuse had occurred. In addition, *Evidence Rule* 63(33) requires corroborating evidence if the child is unavailable.

Moreover, although the State argues that it would prefer to have a "flesh and blood" child-witness for the jury to see rather than elicit hearsay testimony, there is merit to the Appellate Division's comment about the desirability of presenting unvar-

nished testimony, "free of the potential perils of cross-examination." 259 *N.J.Super.* at 97, 611 *A.*2d 659. In *D.R., supra,* we recognized that

> the reliability of in-court testimony of a young child victimized by a sexual assault is often affected by the stress of the courtroom experience, the presence of the defendant, and the prosecutor's need to resort to leading questions. * * * The lapse of time between the sexual assault and the trial can affect the child's ability to recall the incident. In cases where the accused is a member of the child's family or household, the victim may be urged or coerced to recant. In general, the courtroom setting is intimidating to children and often affects adversely their ability to testify credibly.
>
> [109 *N.J.* at 360, 537 *A.*2d 667 (citations omitted).].

Finally, the State knew that the witness and her mother had planned to leave New Jersey before the prosecutor even presented the case to the grand jury in March 1988. Despite that, the State never attempted to get a forwarding address, and there is no evidence that the prosecutor impressed on J.G.'s mother the importance of apprising the State of the family's whereabouts.

The State never asked J.G.'s school whether the mother had left an address or if the school had forwarded records to a school in another state. Prosecutors argued that a neighbor had told them that the child was never in school. However, they failed to provide evidence that the mother had never *enrolled* J.G. in school.

The State never asked the post office whether the family had left a forwarding address, nor did it ask neighbors for the names of family members who might know of the family's location. The State never checked to see whether the mother, who had received welfare in New Jersey, had applied for benefits in Houston, which was the logical place to check because prosecutors had an indication that the family had moved there, or in Florida, another possibility. Rather than "risk a rebuff," *Barber, supra,* 390 *U.S.* at 724, 88 *S.Ct.* at 1322, 20 *L.Ed.*2d at 260, the State did not ask the Houston police for assistance in locating the family, other than to provide the police with one address.

The State did not attempt to use the mother's social security number to check federal and state tax records, or to see whether the family had applied for benefits, credit, a driver's license, or utility services.

We do not imply by this list of possible actions that the State could have taken to locate J.G. that the State was required to leave no stone unturned in all fifty states. However, if the State had attempted any number of those location methods in Houston and/or Florida, one could conclude that the State had conducted a good-faith effort. Instead, because the State performed a minimal search, three weeks before the *Evidence Rule* 8 hearing, the State did not perform a reasonable, duly-diligent search.

We conclude that the introduction of the hearsay testimony with no corroborating evidence violated both the requirements of *Evidence Rule* 63(33) and defendant's constitutional rights. Defendant, who is now on parole, is entitled to a new trial.

The judgment of the Appellate Division is affirmed.

CLIFFORD, J., dissenting.

The sole issue raised on the State's appeal is whether the trial court's ruling that the State had exercised due diligence in its effort to locate the child victim of defendant's sexual molestation represented a sound exercise of discretion. The Court holds that the trial court erred. I disagree, and therefore dissent.

The question before us focuses on *Evidence Rule* 63(33)'s "tender years" exception to the hearsay rule. The *Evidence Rule* is quoted in full in the majority opinion, *ante* at 494, 626 A.2d at 67. In pertinent part the *Rule* permits the introduction into evidence of hearsay statements made by a child under twelve years of age who has allegedly been the victim of a sexual offense if the proponent of the statement meets certain conditions—here, that "the child is unavailable as a witness and there is offered admissible evidence corroborating the act of ·

sexual abuse." For purposes of that *Rule* the term "unavailable as a witness" includes the circumstance that "the proponent of the statement is unable, despite due diligence, to procure the attendance of the witness." *Evid.R.* 62(6)(d).

In this case the corroborating evidence of the act of sexual abuse is provided in lurid detail in defendant's confession, the admissibility of which is nowhere challenged on appeal. Defendant's account of his assault on six-year-old J.G. reads as follows:

Q. Describe the circumstances surrounding the aggravated sexual assault on [J.G.] that happened approximately 12 weeks ago in the camper located in the back yard of 159 Mary Street, Cookstown, NJ.

A. Got off of work a half a day. Went to Henry's liquor store. Bought two bottles of liquor. Drank two bottles of liquor before I went back to the trailer. It was about four or five. [J.G.] asked me to go out and play. I said no because her mom did not want her outside. She went up to the top of whatever you call those things. I was watching T.V. She asked to come down to watch T.V. Took off my work clothes because they were dirty. Layed on the couch on the right-hand side. She gave me head twice. Then I played around a little bit.

\*     \*     \*     \*     \*     \*     \*     \*

Q. What did you mean when you said she gave you head twice?

A. She put my dick in her mouth and sucked on it and after ten minutes I pushed her head away and came.

Q. How did [J.G.] know how to give you oral sex?

A. She has watched dirty tapes with her mom and myself and everyone else.

Q. Did you ejaculate in her mouth?

A. No. I pushed her head away.

Q. Did she give you oral sex again?

A. Yea. About fifteen minutes later she sucked on it again for about four or five minutes and then I told her to stop.

Q. Did you ejaculate the second time she gave you oral sex?

A. No.

Q. What do you mean when you said, "Then I played around a bit"?

A. I put my hands in her pants.

Q. Did you penetrate her vagina?

A. No, Sir.

Q. What part of her body did you touch when you put your hands in her pants?

A. Her pussy, I guess.

Q. Who was home when this occurred?

A. Just me, [J.G.] and her brother and sister were asleep.
Q. Were you babysitting the children on this evening?
A. Yes, Sir.
Q. Did you in any way force her to perform oral sex upon you?
A. No, Sir.
Q. Why would she do it to you?
A. Because I asked her to.

Because the foregoing confession standing alone could not support defendant's conviction, the State sought to buttress the confession through the victim's hearsay statements to her friend G.H. and to Ms. Rudd, a social worker with the Division of Youth and Family Services. But, as we have seen, the admissibility of those hearsay statements itself turns on corroborating proof of the act of sexual abuse, namely, the confession. Therefore, defendant's confession performs double duty: it serves as evidence of defendant's guilt, and it corroborates other evidence of guilt, *i.e.*, the hearsay statements. In short, the case involves cross-corroboration.

The second—and in this case critical—requirement for admissibility of G.H.'s and Ms. Rudd's testimony concerning what J.G. had told them is that the State prove J.G.'s unavailability. The Court's opinion contains the assistant prosecutor's representation of her office's considerable efforts to locate J.G. See *ante* at 491–493, 626 *A*.2d at 65–66. I can add nothing to the court's recital of the State's attempt to find the victim; I simply appraise that attempt differently. I would hold that the trial court properly exercised its discretion in concluding that the State had sought with due diligence to locate and procure the attendance of J.G. Although I hasten to acknowledge that the question is a close one and that I might well have decided it differently in the first instance, my doubts nevertheless are not so grave as to permit me to join the Court's implicit conclusion that no reasonable trial court could have found due diligence in the circumstances presented.

Rather than speculate at length on other steps the State might have taken, the trial court focused on what measures the

State had in fact pursued, and found them adequate for purposes of application of the *Evidence Rule*. As the State points out, few clues suggested the possible whereabouts of J.G. and her mother. Letters sent to two possible addresses in New Jersey were undeliverable. The prosecutor then communicated with the Welfare Board, which provided a possible forwarding street address in Houston, Texas. When the Houston police followed up on that lead, they too came up empty-handed. Without a street address or even a city in which J.G. might be living, the State had little to go on.

Those facts serve to distinguish this case from the only two New Jersey "unavailability" cases cited by the Court. In *State v. Roman*, 248 *N.J.Super.* 144, 590 *A.*2d 686 (App.Div.1991), cited *ante* at 498, 626 *A.*2d at 69, the authorities knew where the witness was located but made no attempt to secure her appearance for trial after the witness had refused to honor a subpoena. In *State v. Hamilton*, 217 *N.J.Super.* 51, 524 *A.*2d 1281 (App.Div.), *certif. denied*, 108 *N.J.* 581, 531 *A.*2d 1355 (1987), cited *ante* at 499, 626 *A.*2d at 70, a case (unlike this one) in which "[t]he proofs against defendant * * * were less than overwhelming," 217 *N.J.Super.* at 55, 524 *A.*2d 1281, the Appellate Division concluded that the State had simply acquiesced in the refusal to cooperate exhibited by those who might have information concerning the missing witness's whereabouts. *Ibid.*

Moreover, another significant feature plays a role in the determination of the State's "diligence" in tracking down a witness: the prosecutor's discretion in allocating resources. In this day of fierce competition for the law-enforcement dollar, courts should be slow to substitute their judgment for that of a prosecutor in the determination of the missions to which limited resources should be devoted. In this case the State had no concrete information concerning J.G.'s actual location or her mother's receipt of State or federal assistance; therefore I would not, on appellate review, characterize as "mistaken" the trial court's exercise of discretion, given the prosecutor's deci-

sion not to send law-enforcement personnel on what could reasonably be viewed as a futile assignment.

The trial court was sensitive to the foregoing concerns, as evidenced by its ruling:

THE COURT: Well, with the benefit of hindsight, I'm sure it can be argued that had they * * * continued their investigation further, maybe they could have located the mother and child some year or more prior to the trial, but I can't really fault the Prosecutor for this. The Prosecutor did what any Prosecutor has done. They carry the file through the stages—the ordinary stages of the plea, the pretrial conference and it's not really until shortly before trial or when trial is scheduled that the Prosecutor makes a serious effort to contact witnesses.

Now, here apparently the Prosecutor's Office was told some almost two years before that the mother and daughter had gone underground and that an attempt had been made to locate them in Texas through contacting the Texas Police Department down there with the results that we've already discussed. I don't think that I have anything before me that suggests that they would have found the mother and child had they continued further two years before. So I have no choice but to find—to make the same finding, that for the purposes of the statute, that the child is unavailable.

I would reverse and remand to the Appellate Division for consideration of defendant's other points, which that court did not reach because of its disposition of the appeal.

*For affirmance*—Justices GARIBALDI, HANDLER, POLLOCK, O'HERN, and STEIN—5.

*For reversal*—Justice CLIFFORD and Chief Justice WILENTZ—2.